957 A.2d 1083

Herschell B. CLAGGETT, Sr.

v.

MARYLAND AGRICULTURAL LAND PRESERVATION
FOUNDATION, et al.

No. 578, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Oct. 6, 2008.

348

350

William C. Parker, II (Sarah M. Schoenfelder, Parker Counts & Melton, LLP on the brief), Easton, for appellant.

Thomas F. Filbert (Craig A. Nielsen, Douglas F. Gansler, Attorney General on the brief), Annapolis, for appellee.

Argued before KRAUSER, C.J., HOLLANDER and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

HOLLANDER, J.

This appeal involves the terms of an agricultural preservation easement conveyed by Herschell B. Claggett, Sr., appellant, to the Maryland Agricultural Land Preservation Foundation ("MALPF" or the "Foundation"), appellee,[1] a division of the Department of Agriculture. The easement, tendered in February of 2000, applied to a tract of land owned by appellant in Kent County, over 200 acres in size (the "Property").[2]

---

**1.** The Chairman of the Foundation and the Secretary of Agriculture are also appellees in their official capacities. For convenience, we shall refer to all of the appellees collectively as "MALPF," the "Foundation," or appellee.

**2.** The tract is described in the land records of Kent County at Liber MLM No. 143, Folio 490.

Under the terms of the Deed of Easement, as well as the law then in effect, appellant retained the right to apply to the Foundation for release from the easement restrictions of a lot of up to two acres "for the purpose of constructing a dwelling house" for his use (the "Owner's Lot"). For that purpose, in 2002 appellant received a "preliminary release" of a two-acre lot. Thereafter, effective October 1, 2004, the General Assembly amended the applicable statute to require that, absent the approval of MALPF, "[a]ny release or preliminary release ... shall include ... [a] statement that the owner's ... lot may not be transferred for 5 years from the date of the final release." In 2005, the Foundation tendered to appellant a proposed "Final Release," which incorporated the provision required by the amended statute.

Appellant refused to sign the proposed release, and proceeded with construction of a residence on the Owner's Lot. He also filed a declaratory action against the Foundation in the Circuit Court for Kent County, contending that he is not bound by the five-year restriction on his right to alienate the Owner's Lot. The circuit court granted dismissal or summary judgment in the Foundation's favor as to all counts of appellant's Complaint.

This appeal followed. Appellant poses two issues:

I. Whether the Circuit Court erred by finding that the Appellees' retroactive application of Md.Code Ann. Agric. § 2–513(b)(2)(vi) to the Deed of Easement did not impair Appellant's vested contractual rights[.]

II. Whether the Circuit Court erred by finding that the Appellees' retroactive application of Md.Code Ann. Agric. § 2–513(b)(2)(vi) to the Deed of Easement did not impair Appellant's substantive rights[.]

For the reasons that follow, we shall reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

The Foundation is empowered "[t]o acquire ... easements ... to restrict the use of agricultural land ... to maintain the character of the land as agricultural land...." Md.Code (2007

Repl.Vol., 2008 Supp.), § 2–504 of the Agriculture Article ("Agric.").[3] *See also* Agric. § 2–502 (establishing the Foundation). The terms of such easements are dictated by the Agriculture Article, and require the grantors to covenant, "for so long as profitable farming is feasible" on the burdened land, Agric. § 2–514(a), that the land will not be used "for any commercial, industrial, or residential purpose." Agric. § 2–513(b).

MALPF acquired an "agricultural preservation easement" from Claggett on February 1, 2000, "in consideration of the sum of . . . $262,190.50."[4] At that time, Md.Code (1999 Repl. Vol.), § 2–513(b) of the Agriculture Article ("Ag–1999") provided, in relevant part:

§ 2–513. **Use of land for which easement purchased.**

\* \* \*

(b) *Use for commercial, industrial, or residential purposes.*—(1) Except as otherwise provided in this section, a landowner, whose land is subject to an easement, may not use the land for any commercial, industrial, or residential purpose.

(2) Except as provided in paragraph (5) of this subsection, on written application, **the Foundation shall release free of easement restrictions only for the landowner who originally sold an easement,** 1 acre or less [5] **for the**

---

**3.** Because this opinion concerns various amendments to the Agriculture Article over the course of years, we shall endeavor to make clear what statutory language was in effect at relevant times. In particular, we shall use the abbreviation "Ag–1999" to refer to the 1999 Replacement Volume of the Agriculture Article, which was in effect when the easement on the Property was created and when appellant obtained his Preliminary Release.

**4.** The Deed by which appellant granted the preservation easement to the Foundation was recorded in Liber MLM No. 190, Folio 558 of the land records of Kent County.

**5.** Ag.–1999, § 2–513(b)(5) increased the maximum lot size to two acres if applicable Department of Environment regulations or the regulations of the local jurisdiction required a minimum lot size for a dwelling

**purpose of constructing a dwelling house for the use only of that landowner** or child of the landowner subject to the following conditions:

\* \* \*

(iii) [6] The landowner shall pay the State for any acre or portion released at the price per acre that the State paid the owner for the easement.

(iv) Before any conveyance or release, the landowner and the child, if there is a conveyance to a child, shall agree not to subdivide further for residential purposes any acreage allowed to be released. The agreement shall be recorded among the land records where the land is located and shall bind all future owners.

(v) After certifying that the landowner or child of the landowner has met the conditions provided in subparagraphs (i) through (iv) of this paragraph, **the Foundation shall issue a preliminary release, which shall:**

1. **Become final when the Foundation receives and certifies a non-transferable building permit in the name of the landowner or child of the landowner for construction of a dwelling house;** or

2. Become void upon the death of the person for whose benefit the release was intended if the Foundation has not yet received a building permit as provided in this subparagraph.

(vi) Any release or preliminary release issued under this paragraph shall include a statement of the conditions under which it was issued, a certification by the Foundation that all necessary conditions for release or preliminary release have been met, and copies of any pertinent documents.

---

house of more than one acre. The parties agree that this provision applied to the Owner's Lot, which was to be two acres in size.

6. Subparagraphs (i) and (ii) provided for the possibility of releasing up to 10 lots per easement in this fashion, subject to density restrictions. The provisions are not directly relevant to the issues on appeal.

(vii) Any release, preliminary release, building permit, or other document issued or submitted in accordance with this paragraph shall be recorded among the land records where the land is located and shall bind all future owners.

(viii) **The Foundation may not restrict the ability of a landowner who originally sold an easement to acquire a release under this paragraph beyond the requirements provided in this section.**

(Emphasis added.)

The Deed of Easement ("Deed" or "Easement") recited that its "covenants, conditions, limitations and restrictions ... are intended to limit the use of [the Property] and are to be deemed and construed as real covenants running with the land," and provided that the Property could "not be used for any commercial, industrial, or residential purpose." Referring to appellant as "Grantor" and the Foundation as "Grantee," the Deed further specified: "This easement shall be in perpetuity, or for so long as farming is feasible on the Grantor's land . . . ."

Under the terms of the Deed, as dictated by then-existing provisions of Ag–1999, § 2–513(b), appellant retained the right to apply to the Foundation to release a lot of up to two acres from the easement restrictions, "for the purpose of constructing a dwelling house for the use only of [appellant] or [appellant's] child," provided that appellant covenant for himself and "all future owners" not to "further subdivide" the released lot, and that he repay the Foundation for the price of the lot at the per-acre price originally paid for the Easement.[7]

In accordance with the statute, the Deed set forth a two-step release procedure, by which MALPF, after receiving appellant's application and payment, would issue a "Preliminary Release," which would "become final when the Foundation receives and certifies a non-transferrable building permit

---

7. Such lots are statutorily termed "owner's lots" or "child's lots," depending on whether the lot is released to the landowner or the landowner's child.

in the name of [appellant] ... for the construction of a dwelling house...." The Deed also set forth the following provisions relating to the release option:

[A(1) ]

(b) As a personal covenant only and one that is not intended to run with the land, the Grantee, on written application from the Grantor, shall release **free of easement restrictions only for the Grantor who originally sold this easement, 1 acre or less** [8] **for the purpose of constructing a dwelling house for the use only of the Grantor** or the Grantor's child subject to the following conditions:

\* \* \*

(ii) The Grantor shall pay the Grantee for any acre or portion thereof released at the price per acre that the Grantee paid the Grantor for the easement provided that the ... Foundation's Board of Trustees have the right to approve the location and configuration of the parcel(s) so conveyed; it being the intent that the agricultural use of the property not be impaired by said partitions;

(iii) Before any conveyance or release, the Grantor and the child, if there is a conveyance to a child, shall agree not to subdivide further any acreage allowed to be released; the agreement shall be recorded among the land records where the land is located and shall bind all future owners;

\* \* \*

(c) Application for Lot Exclusion. Before a lot may be released from an easement's restrictions for the construc-

---

**8.** A later provision in the Deed stated: "The limitations set forth under paragraph (1)(b) that the maximum lot size be 1 acre or less is increased to two acres or less if the circumstances described in Agriculture Article, Section 2–513, Annotated Code of Maryland, exist." Those circumstances existed in this case.

tion of a dwelling house, the landowner shall submit an application to the Foundation that:

(i) The landowner has signed;

(ii) **Contains a declaration that the lot and dwelling house are only for the use of the landowner** or the landowner's child, whichever is the case (if the use is for the landowner's child, identify the child);

\* \* \*

(d) After certifying that the landowner or child of the landowner has met the conditions provided in subsections (a) and (b) of this section, **the Foundation shall issue a Preliminary Release which shall:**

(i) **Become final when the Foundation receives and certifies a non-transferrable building permit in the name of the landowner** (or child of the landowner if the proposed lot is intended for the landowner's child's use) for the construction of a dwelling house; or

(ii) Become void upon the death of the person for whose benefit the release was intended if the Foundation has not yet received a building permit as provided in this regulation.

(e) **Any preliminary or final release,** building permit or other document issued or submitted in accordance with this section shall be recorded among the land records where the land is located at the landowner's expense and **shall bind all future owners.**

\* \* \*

**The right reserved to the Grantor under paragraph (1)(b) belongs only to the Grantor who originally sold this easement and may be exercised only by the Grantor named in the instrument.** (Emphasis added.)

Sometime thereafter, appellant requested the exclusion of a

two-acre lot from the easement restrictions.[9] The Foundation responded by letter on June 28, 2001, stating that "the Foundation's Board of Trustees approved your request to exclude a 2.00 acre owner's lot from your 208.39 acre easement property for the construction of a dwelling house intended for your use." MALPF's letter explained the remainder of the "two-stage release process" that would culminate in a final release:

A Preliminary Release and Agreement will be recorded in the land records outlining conditions of the release. A second (final) Release and Agreement will also be recorded upon request releasing the lot of all easement restrictions once a non-transferrable building permit is presented to the Foundation in your name.

Before a preliminary release can be prepared, the Foundation requires the following:

1. Reimbursement of the amount paid to you by the Foundation for the requested lot. Our records show this total amount to be $2,470, @ $1,235 per acre.

2. A metes and bounds description of the lot. . . .

When the reimbursement and the metes and bounds description of the lot are received by the Foundation, a Preliminary Release will be prepared and sent to you to sign. . . .

Upon compliance with all of the terms and conditions of the Preliminary Release and Agreement, you will have the right to request that a final Release and Agreement be prepared and recorded to complete the two-stage release process. A final release will be prepared once the Foundation receives and certifies a non-transferrable building permit in your name.

Accordingly, appellant remitted payment and a metes and bounds description of the Owner's Lot.[10] The Foundation then sent appellant a "Preliminary Release and Agreement," which

---

9. Appellant's actual request is not contained in the record, and the parties have not informed us of the exact date of the request.

10. The record does not disclose the exact date of the transaction.

the parties executed and recorded in the land records of Kent County on October 17, 2002. The Preliminary Release, which referred to the Foundation as "Releasor" and appellant as "Releasees," stated:

> [I]n consideration of . . . payment by the Releasees to the Releasor of the sum of $2,470.00 and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Releasor hereby conditionally releases [the Owner's Lot] from restriction contained in the agricultural land preservation easement, subject, however, to the terms and conditions hereinafter set forth, including the condition that its use be for the purpose of constructing a dwelling house for the owner's residence.

The Preliminary Release also set forth the following "terms and conditions":

1. The Releasees, on behalf of themselves, their Personal Representatives and assigns . . . grant and relinquish the right to subdivide the [Owner's Lot]. This grant and relinquishment of right shall be deemed and construed as a real covenant, running with the land, and shall bind all current and future owners and any other person, firm or corporation having any interest in the subject property.

2. This preliminary release shall:

 a) Become final when the Foundation receives and certifies a nontransferable building permit in the name of the landowner for the construction of a dwelling house **and issues a final release;** or

 b) Become null and void upon the death of the person [for] whose benefit the release was intended if the Foundation has not received a building permit as provided in the subparagraph.

3. Subject to the proceeding [sic] Paragraphs 1 and 2 it is the intent of this instrument to release the above described 2.00 acres parcel of land from agricultural easement restrictions set forth in the above mentioned Deed of Easement **for the purpose of constructing a dwelling. The parties agree that this right may not be**

**transferred to any person.** However, all of the terms, covenants, conditions, limitations and restrictions set forth in the Deed of Easement shall remain in full force, operation and effect on the remaining portions of the Releasees' land not herein or heretofore expressly released.

\* \* \*

5. Upon compliance with all of the terms and conditions hereinabove set forth, the Releasees shall have the right to request that the above described parcel of 2.00 acres be released from the operation and effect of the Deed of Easement **subject only to the Terms and Conditions set forth in Paragraphs 1, 3 and 4 above.** (Emphasis added.)

Appellant later submitted a building permit in accordance with the terms of the Preliminary Release. The record does not disclose the date of the submission. Nor does it reveal whether the permit was submitted before or after the enactment of two amendments to § 2–513 of the Agriculture Article that are relevant here.

Effective October 1, 2003, the General Assembly enacted 2003 Md. Laws ch. 258 ("Chapter 258"), which amended Agric. § 2–513 by reducing the total number of owner's or children's lots that could be released from an agricultural preservation easement from ten to three, and adding a new § 2–513(b)(3), which provided:

A landowner may reserve the right to exclude 1 unrestricted lot from an easement in lieu of all owner's and children's lots to which the landowner would otherwise be entitled under paragraph (2) of this subsection, subject to the following conditions:

\* \* \*

(ii) An unrestricted lot may be subdivided by the landowner from the easement and sold to anyone to construct one residential dwelling;

* * *

(iv) The landowner shall agree not to subdivide further for residential purposes any acreage allowed to be released, and the agreement shall be recorded among the land records where the land is located and shall bind all future owners;

(v) The right to the lot is taken into consideration in the appraisal of fair market value and determination of easement value;

(vi) The lot can be subdivided at any time and the location of the lot to be subdivided is subject to the approval of the local agricultural advisory board and the Foundation; and

(vii) If the property is transferred before the right to exclude the lot has been exercised, the right may be transferred with the property.

One year later, effective October 1, 2004, the General Assembly again amended Agric. § 2–513, adding language to § 2–513(b)(2)(vi) requiring that "[a]ny release or preliminary release issued under this paragraph shall include ... [a] statement that the owner's ... lot may not be transferred for 5 years from the date of the final release," absent the approval of the Foundation or another exception not applicable here. 2004 Md. Laws ch. 498 ("Chapter 498"). As amended by Chapter 498, Agric. § 2–513(b)(2)(vi) stated (new language underlined): [11]

---

**11.** Effective October 1, 2008, Agric. 2–513(b)(2)(vi) was again amended. Although the amendment is not relevant here, we note that what was (b)(2)(vi)(2) is now (b)(2)(vi)(3). The new (b)(2)(vi)(2) requires the inclusion in a final or preliminary release of

A statement by the landowner or child of the landowner that acknowledges that:

A. Adjacent farmland that is subject to an agricultural land preservation easement maybe used for any agricultural purpose and may interfere with the use and enjoyment of the property through noise, odor, vibration, fumes, dust, glare, or other interference;

B. There is no recourse against the effects of any normal agricultural operation performed in accordance with good husbandry practices; and

Any release or preliminary release issued under this paragraph shall include:

1. A statement of the conditions under which it was issued, a certification by the Foundation that all necessary conditions for release or preliminary release have been met, and copies of any pertinent documents;

2. *A statement that the owner's or child's lot may not be transferred for 5 years from the date of the final release, · except on:*

 A. *Approval by the Foundation; or*

 B. *Notwithstanding any conditions on transfers imposed under item 1 of this subparagraph, a lender providing notice to the Foundation of a transfer pursuant to a bona fide foreclosure of a mortgage or deed of trust or to a deed in lieu of foreclosure.*

On June 7, 2005, after the effective date of the amendments, the Foundation wrote to appellant, acknowledging receipt of his non-transferable building permit and attaching a proposed "Final Release and Agreement" for his signature. In addition to other terms and conditions that were substantially equivalent to those contained in the Preliminary Release, the proposed Final Release stated:

[I]t is the intent of this instrument to release the [Owner's Lot] for the personal residential use of the person named in the building permit.... *The parties agree that this right may not be transferred to any other person for five (5) years from the date of the final release, except on:*

a) Approval by the Foundation; or

b) Notwithstanding any conditions on transfers imposed under item 1 of this subparagraph [sic], a lender providing notice to the Foundation of a transfer pursuant to a bona fide foreclosure of a mortgage or deed of trust or to a deed in lieu of foreclosure. (Emphasis added.)

---

C. Acknowledgments made under items A and B of this item are binding to any successor or assign of the landowner or child....

Appellant refused to sign the proposed Final Release. Through counsel, he wrote to the Foundation, questioning whether he was subject to the language derived from Chapter 498, prohibiting transfer of the Owner's Lot for five years from the date of the final release, given that Chapter 498 was enacted after the execution of the Easement and the Preliminary Release. On September 12, 2005, the Foundation responded, maintaining that appellant was subject to Chapter 498. It explained:

As the easement grantor, only [appellant] has the one time right to an owner's lot for the purpose of constructing a dwelling solely for his personal use. Before Chapter 498's enactment the law did not allow a released lot for a dwelling to be conveyed to any other person but restricted its use to the landowner who sold the easement. This left the released owner's lot in legal limbo with lenders and others that was corrected by the enactment of Chapter 498 (effective October 1, 2004) that now allows certain transfers.

\* \* \*

Chapter 498 . . . provides a benefit to landowners, such as [appellant], who make application for allowable lot releases after October 1, 2005; again, this benefit allows them to transfer owner's lots to others, whereas before, the law did not provide this opportunity.

Lastly, the Foundation does not have the authority to waive the language release requirements of Chapter 498; [appellant] applied for a lot release after Chapter 498's effective date and he is subject to its requirements.

On November 9, 2006, appellant filed a "Complaint for a Writ of Mandamus and Declaratory Judgment" against Lewis R. Riley, then the State Secretary of Agriculture, and James Conrad, Executive Director of the Foundation. Appellant filed an amended complaint on January 8, 2007, adding the Foundation as a defendant and substituting Daniel W. Colhoun, the Chairman of the Foundation, for Conrad. After

Roger L. Richardson succeeded Riley as Secretary, Richardson was substituted for Riley, pursuant to appellees' motion.

In his amended complaint, appellant sought a declaratory judgment that Chapter 498 "may not be applied retroactively to modify the terms and conditions of the Deed of Easement or the terms and conditions of the final release to which [appellant] is entitled." He also sought a writ of mandamus ordering appellees to execute a final release that did not include the terms derived from Chapter 498. Additionally, appellant sought damages in the amount of $100,000, plus attorneys' fees and costs.

On April 9, 2007, appellees moved to dismiss and/or for summary judgment. In an affidavit of Conrad, appended to the motion, Conrad opined that, under the terms of appellant's Deed of Easement and the proposed Final Release, "the dwelling is only for Claggett's use; the easement does not grant Claggett the right to sell or transfer the dwelling." Conrad asserted that before Chapter 498's enactment,

> MALPF's long-standing administrative practice was to allow or approve dwelling transfers after a dwelling is constructed and is actually occupied by the owner, upon the occurrence of any of the following events: (1) death of the owner; (2) upon a mortgage foreclosure; (3) upon a change in employment or upon the illness of the owner; (4) or for any reason when MALPF determines that it would be impracticable for the dwelling to be occupied by the owner.

Conrad explained that, by enacting Chapter 498, the General Assembly "provided MALPF with a procedure to ensure that a landowner is using the dwelling after it is constructed for his use and not immediately selling it as a commercial investment." According to Conrad, after the enactment of Chapter 498, the Department of Agriculture promulgated an "interpretive regulation" in the Code of Maryland Regulations ("CO MAR"), incorporating the Foundation's administrative practice with respect to dwelling transfers and the requirements of Chapter 498. *See* COMAR 15.15.06 (discussed *infra*). Conrad also said: "It has been MALPF's administra-

tive practice to follow Chapter 498 and provide the required language in all releases granted by MALPF on or after October 1, 2004."

Appellant responded on April 19, 2007. In his affidavit, he averred that he included in his application for release "a declaration that the lot and dwelling house are only intended for the use of the landowner." Moreover, he stated: "I have actually resided in the dwelling on the two (2) acre lot since it was constructed as I had declared in my application it was my intent to do."

The court heard appellees' motion on April 24, 2007. The Foundation contended that the right to an owner's lot is "a personal covenant, one not intended to run with the land, a limited right that may not be conveyed to a third person." It also asserted: "This restriction prohibiting Mr. Claggett from conveying this right to a third person was expressly noted . . . in the preliminary release that the Foundation issued Mr. Claggett in 2002."

While opposing appellees' motion for summary judgment, appellant maintained that "the matter is ripe for resolution by this Court by the issuance of a Declaratory Judgment and a Writ of Mandamus." Appellant's counsel asserted that the Foundation's "restriction prevents Mr. Claggett from doing things like estate planning," and explained that under the restriction, "he can't transfer the property to his wife. Mr. Claggett was not married in 2000 when he granted the deed of easement. He is married now. He can't transfer by inter vivos deed to his wife to even out their holdings for estate planning purposes."[12] The circuit court inquired whether appellant had asked the Foundation to "approve release of [the] land if [appellant] transferred it to [his] wife," to which appellant's counsel responded, "No. But he shouldn't have to. That's the point of why we're here." When asked whether

---

12. Appellant asserts in his brief that, in objecting to the inclusion of the Chapter 498 terms in the Final Release, his "only wish[ ]" was jointly titling the Owner's Lot with his wife or "otherwise [sic] alter[ing] the title to the lot to assist in his estate planning."

appellant could transfer title to his wife's name alone, counsel for the Foundation conceded, "[t]hat would be a problem...." [13]

After considering the arguments of counsel, the court ruled from the bench. It said, in part:

This case raises the question of the retroactivity of the statute that was enacted effective October 1, 2004 to state that the owner of a two acre lot, an owner's lot or family lot, that was before subject to the restrictions of an Agriculture Foundation Preservation Foundation [sic] easement could not sell that lot for a period of five years from the date of the final release from the easement. And as Counsel know every [sic] well, there is a presumption against such retroactivity of a statute. There are exceptions to that presumption. The presumption is overcome if the statute affects only procedures or remedies. And that's the position of the [Foundation]—that this statute affected only procedures and remedies and it actually benefits the landowner because, until this statute, the [Foundation] argues, there is no right to transfer the lot, and this at least allows that lot to be transferred after the owner resides on the property or owns the house for five years. [Appellant's counsel] says that the [Foundation] is therefore missing the point either accidentally or deliberately that the distinction is between the building permit issuance and ... the release and the transfer without that building permit and final release. This ... case is distinguished because there is a house already built, built by the owner, apparently, with a building permit issued some two years ago.

The [appellant] has filed an amended complaint seeking a declaratory judgment and a writ [of] mandamus.... [A]nd ... the easy part of the case, that this Court award [appellant] damages in the amount of $100,000.00 plus reasonable attorney's fees and the cost of this proceeding. And

---

**13.** In its brief, the Foundation now asserts that "MALPF never—and would not now—object to the addition of [appellant's] new wife to the title of his lot."

the Court says that's the easy part because the Court accepts the [Foundation's] argument that, under the Doctrine of Sovereign Immunity, the [appellant's] claim for money damages is barred. And, therefore, that portion of Count 2 is dismissed.[14]

The [Foundation] also argues that there's no justiciable issue between the Parties and, therefore, Count 1 must be dismissed and argues that, as we've noted, Count 2 should also be dismissed.

The Court is troubled by the case in that the whole purpose of the Agricultural Preservation Foundation easement was to protect agricultural land and to stop the diminution of acreage in agricultural use. That purpose is no longer applicable to this lot. The house is there. It's now residential property. And the entire purpose of the Ag Preservation Foundation ... has been circumvented in part by the owner's provisions that the Foundation itself proposed to permit one owner's house, and in part by Mr. Claggett proceeding to construct this house pursuant to his building permit without having first secured the executed release from the Maryland Agricultural Preservation Foundation.

The Court finds that the [Foundation's] intent and the Legislative intent in passage of ... Chapter 498 of the Laws of 2004 is clear. [T]he [Foundation's] intent and the Legislature's intent was to restrict transfer of such properties for a period of five years from the issuance of the final release. Accordingly, we find that Mr. Claggett was subject to the provisions of the [Foundation] and the legislation, and we will grant summary judgment to the [Foundation] with respect to the declaratory judgment ... count and will grant summary judgment as to the remainder of the writ of mandamus that was not already dismissed, being that part that sought money damages.

---

**14.** On appeal, appellant does not challenge this aspect of the court's ruling.

The court entered an Order effectuating its oral ruling on May 7, 2007. It stated:

(1) [The Foundation's] Motion is granted and ... Summary Judgment for both Counts One (Complaint for Declaratory Judgment) and Two (Action for Writ of Mandamus) of [Appellant's] Amended Complaint is entered in [the Foundation's] favor;

(2) Under Count One, Chapter 498, *Laws of Maryland,* 2004 is declared to apply to the Final Release from the agricultural land preservation easement that [appellant] is requesting for an Owner's Lot to construct a dwelling for his use; and

(3) [Appellant's] Action for Writ of Mandamus under Count Two, including his request for monetary damages, which is barred by sovereign immunity, is dismissed.

## DISCUSSION

 The granting of summary judgment in a declaratory action is " 'the exception rather than the rule.' " *Utica Mut. Ins. Co. v. Miller,* 130 Md.App. 373, 380, 746 A.2d 935, *cert. denied,* 359 Md. 31, 753 A.2d 3 (2000) (citations omitted). " 'Our standard of review of [a][ ] declaratory judgment entered as the result of the grant of a motion for summary judgment is whether that declaration was correct as a matter of law.' " *Olde Severna Park Improvement Ass'n v. Gunby,* 402 Md. 317, 329, 936 A.2d 365 (2007) (quoting *South Easton Neighborhood Ass'n v. Town of Easton,* 387 Md. 468, 487, 876 A.2d 58 (2005)). We "review the record in the light most favorable to [appellant as] the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Educational Testing Service v. Hildebrant,* 399 Md. 128, 140, 923 A.2d 34 (2007). When, as here, there is no dispute of material fact, "we proceed to determine whether the moving party is entitled to judgment as a matter of law." *Hill v. Knapp,* 396 Md. 700, 711, 914 A.2d 1193 (2007).

Appellant argues that "the lower court erred in its application of Chapter 498 by applying it retroactively to alter the terms of Appellant's Final Release from the February 1, 2000 Deed of Easement." In particular, he complains of the inclusion of the following language in the proposed Final Release: "[I]t is the intent of this instrument to release the [Owner's Lot] for the personal residential use of the person named in the building permit. . . . The parties agree that this right may not be transferred to any other person for five (5) years from the date of the final release," except under certain conditions. In appellant's view, this language constitutes "a five year restriction on the alienability of the two-acre lot which . . . was not included in the terms of the Deed of Easement, the Preliminary Release, or in the law in effect at the time the Deed of Easement was executed by Appellant and delivered to MALPF. . . ."

Appellant "contends that there can be no doubt that Chapter 498 added a new restriction to the alienability of title to Appellant's two-acre lot which restriction was not a part of the Deed of Easement or Preliminary Release." He adds: "It is equally clear that this new restriction materially alters and impairs Appellant's rights to deal in and with his property for a period of five years from the date of the Final Release."

According to MALPF, appellant errs in asserting "that Chapter 498 impairs his right to transfer the owner's lot," and mis characterizes Chapter 498 as imposing a "Five–Year Restriction." In its view, the statute "is not a restriction at all, but a benefit to Mr. Claggett. . . ."

The Foundation explains that, under the terms of the Deed and the provisions of the Agriculture Article in effect at the time the Easement was granted, appellant "would not have been permitted to transfer the released lot and dwelling except under circumstances consistent with MALPF's long-standing administrative practice." As a result of the passage of Chapter 498, however, the Foundation claims that appellant "is free to transfer the lot without MALPF's permission after five years have elapsed from the date of the Final Release."

According to MALPF, by enacting Chapter 498, "the Legislature has granted [appellant] the unconditional right to transfer his owner's dwelling lot five years from the date of the final release, a right that does not exist in his Deed of Easement and did not exist before Chapter 498's enactment."

Thus, the Foundation maintains that the circuit court
was correct in concluding that the General Assembly intended Chapter 498 to apply to Mr. Claggett's Final Release. Contrary to his claim, Chapter 498 does nothing to interfere with Mr. Claggett's right to an owner's lot under the Deed of Easement. Instead, Chapter 498 provides a remedy that addresses the General Assembly's concern over the potential for abuse over the transfer of an owner's lot to ineligible persons once MALPF grants a Final Release this lot.

The Foundation posits that "MALPF has not given retroactive effect to Chapter 498 beyond anything intended by the legislature. MALPF followed the legislature's direction that Chapter 498 applies to all releases issued on or after October 1, 2004. Mr. Claggett applied for his Final Release after Chapter 498's effective date." In addition, it argues:

[S]ince the statements required by Chapter 498, *Laws of Maryland* 2004, do not affect Mr. Claggett's right to a lot for a dwelling provided in the Deed of Easement and only provides remedies and procedures for the enforcement of that right, the lower court correctly determined that the Legislature intended Chapter 498 to apply to Claggett's pending request for a Final Release. Any other decision allowing Mr. Claggett to sell or transfer his owner's dwelling and lot anytime he wishes would be contrary to the Deed of Easement and the requirements of State law, and would undermine one of the fundamental deed covenants provided in each of the more than 1800 easements held by MALPF.

Appellant has framed the issues on appeal in terms of whether Chapter 498 applies retroactively to his easement. Ordinarily, "statutes are presumed to operate prospectively." *Roth v. Dimensions Health Corp.*, 332 Md. 627, 636, 632 A.2d

1170 (1993). "Once a party enters into a contract valid under the statute at the time of execution, subsequent statutes, generally, cannot impair the operation of those contracts." *Selig v. State Highway Admin.*, 383 Md. 655, 677, 861 A.2d 710 (2004); *see also County Comm'rs for Carroll County v. Forty West Builders, Inc.*, 178 Md.App. 328, 373–90, 941 A.2d 1181, *cert. denied*, 405 Md. 63, 949 A.2d 652 (2008). Thus, a statute cannot be applied retroactively if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Products*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Nevertheless, there is "no absolute prohibition against retroactive application of a statute." *Comm'n on Human Relations v. Amecom Div.*, 278 Md. 120, 123, 360 A.2d 1 (1976). The Court of Appeals has described a retroactive statute as "one which purports to determine the legal significance of acts or events that have occurred prior to the statute's effective date." *Id.*

 One exception to the general rule of prospective application concerns legislation involving procedural changes that provide remedies for the enforcement of rights. *See Roth*, 332 Md. at 636, 632 A.2d 1170 ("Notwithstanding this presumption [against retroactivity], if the statute 'contains a clear expression of intent that it operate retrospectively, or the statute affects only procedures or remedies, it will be given retroactive application.' ") (quoting *Amecom Div.*, 278 Md. at 124, 360 A.2d 1); *Mason v. State*, 309 Md. 215, 219–20, 522 A.2d 1344 (1987) ("Despite the presumption of prospectivity, a statute effecting a change in procedure only, and not in substantive rights, ordinarily applies to all actions whether accrued, pending or future, unless a contrary intention is expressed. . . ."); *Kelch v. Keehn*, 183 Md. 140, 144, 36 A.2d 544 (1944) ("Where the effect of the statute is not to obliterate existing substantial rights but affects only the procedure and remedies for the enforcement of those rights, it applies to all actions whether accrued, pending or future, unless a contrary intention is expressed.").

■ Maryland law recognizes four basic principles regarding the application of statutes to events that occurred prior to their effective date. These principles, set forth in *Allstate Ins. Co. v. Kim,* 376 Md. 276, 289, 829 A.2d 611 (2003), are as follows:

> (1) Statutes are presumed to operate prospectively unless a contrary intent appears; (2) a statute governing procedure or remedy will be applied to cases pending in court when the statute becomes effective; (3) a statute will be given retroactive effect if that is the legislative intent; but (4) even if intended to apply retroactively, a statute will not be given that effect if it would impair vested rights, deny due process, or violate the prohibition against *ex post facto* laws.

*See also WSSC v. Riverdale Heights Fire Co.,* 308 Md. 556, 563–64, 520 A.2d 1319 (1987).

The parties do not disagree over the present meaning of Agric. § 2–513, as amended by Chapter 498.[15] As we have indicated, under the current statute, a landowner who obtains an owner's release requires the Foundation's permission to sell or transfer the owner's lot until five years after the lot is released; after five years have passed, the landowner may freely alienate the lot. However, the parties vigorously dispute what rights the statute provided to landowners before Chapter 498 was enacted.

The parties' positions on the retroactivity of Chapter 498 are predicated on their respective interpretations of the substantive provisions of Ag–1999 § 2–513, which were in effect prior to the enactment of Chapter 498, at the time when the Deed and the Preliminary Release were executed. The par-

---

**15.** Indeed, the record contains a Deed of Easement dated March 6, 2007, granting the Foundation an agricultural preservation easement for another parcel owned by appellant. In the affidavit appellant submitted with his response to the Foundation's summary judgment motion, he said: "I understand and acknowledge that should I request a dwelling lot release from my 2007 Deed of Easement, any release will include the Five Year Restriction. However, I made no such agreement in the Deed of Easement dated February 1, 2000."

ties' fundamental disagreement pertains to what rights appellant had under Ag–1999 § 2–513. We explain.

Appellant contends that he had the right to sell his Owner's Lot under the statutory scheme that existed before Chapter 498 was enacted. He believes, therefore, that retroactive application of Chapter 498 would impair his vested contractual rights by creating a substantive restriction on the alienability of his Owner's Lot.

Conversely, under the Foundation's interpretation of the relevant provisions of the Agriculture Article, the restriction on alienability existed before Chapter 498 was enacted. MALPF claims that, before the amendment was passed, any transfer of an owner's lot was subject to its approval. In the Foundation's view, Chapter 498 actually represents a relaxation of the restriction, because it provides that, once five years have elapsed after the release of an owner's lot, the Foundation's approval is no longer required in order to sell the lot. Thus, the Foundation's view as to retroactive application is predicated on its view of Chapter 498 as a procedural enactment that enlarges appellant's substantive rights.

The parties agree that Ag–1999 § 2–513 specifies a right that is reserved only to appellant. The question is, what is the nature of that right? Notably, the Foundation does not argue that, if Chapter 498 does, in fact, impose a new restriction on alienability, the restriction is nonetheless enforceable retroactively. If the Foundation is correct that, even before Chapter 498 was enacted, appellant was barred from selling his Owner's Lot, appellant presumably would not quarrel with a retroactive application of Chapter 498 that would lift this restriction after five years.

To resolve the controversy, we must construe Ag–1999 § 2–513. We have not found a reported decision in Maryland that has interpreted this statute.

■ In the first instance, the parties' rights are contractual. The relevant provisions of the Agriculture Article authorize the Foundation to acquire easements and grant releases. But, it is the easement and release agreements themselves that

directly establish the rights of the parties. Nevertheless, when, as here, "the terms of the contract are derived from explicit statutory guidelines ... the paramount consideration is interpreting the pertinent statutory provision." *Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 210, 783 A.2d 194 (2001). *See also Forty West,* 178 Md.App. at 381, 941 A.2d 1181 (" '[P]arties to a contract are presumed to contract mindful of the existing law and ... all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident.' ") (quoting *Auction & Estate Reps., Inc. v. Ashton,* 354 Md. 333, 344, 731 A.2d 441 (1999)). Therefore, the language of the Agriculture Article is central to our determination.

▮▮▮▮▮ " 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature.' " *Chow v. State,* 393 Md. 431, 443, 903 A.2d 388 (2006) (quoting *Kushell v. Dep't of Natural Resources,* 385 Md. 563, 576, 870 A.2d 186 (2005)). In our effort to effectuate the Legislature's intent, we give the words of a statute their ordinary and usual meaning. *City of Baltimore Dev. Corp. v. Carmel Realty Assocs.,* 395 Md. 299, 318, 910 A.2d 406 (2006); *Ridge Heating, Air Conditioning and Plumbing, Inc. v. Brennen,* 366 Md. 336, 350, 783 A.2d 691 (2001). We may also consider " 'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' " *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.,* 358 Md. 129, 135, 747 A.2d 625 (2000) (citation omitted). Further, we are obligated to construe the statute as a whole, so that all provisions are considered together and, to the extent possible, reconciled and harmonized. *Navarro–Monzo v. Washington Adventist,* 380 Md. 195, 204, 844 A.2d 406 (2004). Where "appropriate," we interpret a provision "in the context of the entire statutory scheme of which it is a part." *Gordon Family Partnership v. Gar on Jer,* 348 Md. 129, 138, 702 A.2d 753 (1997).

If a statute is not ambiguous, we generally will not look beyond its language to determine legislative intent. *Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987). When faced with an ambiguous statute, however, the court "may employ 'all the resources and tools of statutory construction'" to ascertain its meaning, "including legislative history, prior case law, and statutory purpose." *Reier v. State Dep't of Assessments and Taxation,* 397 Md. 2, 27, 915 A.2d 970 (2007) (citation omitted). *See Mayor and City Council of Baltimore v. Chase,* 360 Md. 121, 131, 756 A.2d 987 (2000) (noting that even when the language of a statute is plain, we may confirm our construction of it by reference to its legislative history). If the language of a statute is ambiguous, then we "consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of [the] enactment [under consideration]." *Fraternal Order of Police v. Mehrling,* 343 Md. 155, 174, 680 A.2d 1052 (1996) (citation omitted). And, "we presume that the Legislature has acted with full knowledge of prior and existing law, legislation and policy...." *Taylor v. Mandel,* 402 Md. 109, 131, 935 A.2d 671 (2007); *see Dep't. of Health & Mental Hygiene v. Kelly,* 397 Md. 399, 420, 918 A.2d 470 (2007).

At the time the Easement and Preliminary Release were executed, Ag–1999 § 2–513(b)(2) provided that, "on written application, the Foundation shall release free of easement restrictions only for the landowner who originally sold an easement, [an owner's lot] for the purpose of constructing a dwelling house for the use only of that landowner...."

The statute spelled out the mechanics of the release scheme in detail. Upon receipt of an application and certification that appellant met relevant conditions, the Foundation was required to "issue a preliminary release," which would "[b]ecome final when the Foundation receives and certifies a non-transferable building permit in the name of the landowner ... for construction of a dwelling house...." Ag–1999 § 2–513(b)(2)(v). The statute also provided: "Any release, preliminary release, building permit, or other document issued or

submitted in accordance with this paragraph shall be recorded among the land records where the land is located and shall bind all future owners." Ag–1999 § 2–513(b)(2)(vii). Any preliminary or final release was required to include "a certification by the Foundation that all necessary conditions for release or preliminary release have been met. . . ." Ag–1999 § 2–513(b)(2)(vi), including that the "dwelling house [be] for the use only of that landowner" who originally sold the easement. Ag–1999 § 2–513(b)(2).

In the court below, appellant contended that "[t]he right to build the house is what is not transferable, not the right to sell the lot once the house has been built for Mr. Claggett's personal use." In his view, if the owner obtained a preliminary release and a nontransferable building permit, and constructed a dwelling for the owner's residence, the landowner would be able to sell the owner's lot, and the dwelling on it, to any person at any time. Put another way, having constructed the house with a good faith intent to use it for his own residence, appellant insists he is not barred from selling the house to a third party.

Under appellant's interpretation of the statutory release scheme, only the original landowner would be entitled to the release of an owner's lot. Consequently, if an easement grantor did not take advantage of the release procedure before selling the burdened property, a subsequent purchaser would be unable to obtain the release of an owner's lot. Moreover, if a grantor commenced the release procedure and obtained a preliminary or final release, but then sold the entire burdened property and/or an owner's lot before constructing a dwelling, the subsequent purchaser would be unable to build a dwelling on the unimproved owner's lot, because the building permit required to obtain a release is non-transferable.

In arguing that the Foundation may not add additional requirements to the statutory release scheme, appellant relies on the provision of Ag–1999 § 2–513(b)(2)(viii), in effect at the time he granted the Easement. It provided: "The Foundation may not restrict the ability of a landowner who originally

sold an easement to acquire a release under this paragraph beyond the requirements provided in this section."

In contrast, the Foundation contends that, under Ag–1999 § 2–513, appellant was not "permitted to transfer the released lot and dwelling," absent the Foundation's approval. The Foundation rejects appellant's reliance on § 2–513(b)(2)(viii), reasoning that "[s]ince Chapter 498 is now a part of § 2–513 there is no violation of this section because MALPF is not requiring anything to be in the Claggett release that is 'beyond the requirements provided in this section [§ 2–513].' "

■ In our view, the Foundation's interpretation of Ag–1999 § 2–513 is incorrect. We explain.

The plain language of Ag–1999 § 2–513 does not contain an explicit restriction on the right of a landowner who has obtained the release of an owner's lot to sell the lot to a third party. The statute simply does not speak to the issue. Until the enactment of Chapter 498, there was no mention in § 2–513 of the alienability *vel non* of an owner's lot. Rather, Ag1999 § 2–513 spoke in terms of the "use" of the owner's lot. Other than restrictions on further subdivision of an owner's lot, *see* Ag–1999 § 2–513(b)(2)(iv), Chapter 498 marks the first appearance in the statutory scheme of any language that explicitly suggests a restriction on the landowner's ability to transfer the lot to another person. It speaks directly in terms of alienability of the lot, providing that *"the owner's ... lot may not be transferred* for 5 years from the date of the final release...." 2004 Md. Laws ch. 498, at 2330 (emphasis added). On its face, this is a restriction on the alienability of property, which does not appear in Ag–1999 § 2–513.

Thus, the plain text of Ag–1999 § 2–513 suggests that the Foundation is incorrect. The Foundation's interpretation of the pre-Chapter 498 statute requires a significant inferential leap: the Foundation derives an *implied* restriction on alienability from language that, at most, only explicitly restricts the use of an owner's lot.[16]

---

**16.** The proposed Final Release that the Foundation tendered to appellant alters the language of Chapter 498 to achieve consistency with the

In MALPF's view, "the construction of a dwelling is for Claggett's use only," and it is the right to use the dwelling for residential purposes that is nontransferable. Put another way, the Foundation considers the right to "use" the constructed dwelling to be reserved "only for Mr. Claggett; a personal covenant [that] does not pass and cannot be transferred or assigned by Mr. Claggett to any future owner of the farm."

To be sure, the language of Ag–1999 § 2–513 can be read grammatically to support the view that only the original landowner may *use* an owner's lot for residential purposes. In the provision that the Foundation "shall release [a lot] free of easement restrictions *only for the landowner* who originally sold [the] easement," the ambiguity concerns what is modified by the phrase "only for the landowner." Ag–1999 § 2–513(b)(2). (Emphasis added.) "[O]nly for the landowner" may refer back to "release," i.e., the right to obtain a release (supporting appellant's view) or "free of easement restrictions," i.e, the right to use the lot for residential purposes (supporting the Foundation's view).

As the Foundation construes the statute, only the landowner may possess an owner's lot that is "free of restrictions." This is because the statute says "free of easement restrictions only for the landowner. . . ." MALPF relies on its "long-standing administrative practice," later codified in COMAR 15.15.06, by which the Foundation, as grantee of an easement, permits a grantor to transfer an owner's lot only under certain conditions.[17]

---

Foundation's interpretation. The Final Release states that the intent of the instrument is to release the Owner's Lot "for the *personal residential use* of the person named in the building permit. . . . The parties agree that *this right* may not be transferred to any other person for five (5) years from the date of the final release. . . ." (Emphasis added). This is a restriction on alienation of the right to residential use of the Property, not a restriction on the alienation of the Property itself.

17. The Foundation has not urged this Court to give any special deference to its interpretation of § 2–513. Nevertheless, there is authority in Maryland for the proposition that an agency's interpretation of the

Under COMAR 15.15.06.01(C), an owner's lot "may not be transferred to any other person," except as provided by the regulation. COMAR 15.15.06.05(A) states that a landowner who obtains the release of an owner's lot "may not transfer or lease the lot to any person except after the expiration of 5 years from the date of the Foundation's final release for the lot." Further, COMAR 15.15.06.05(A) provides:

Before the expiration of the 5–year period, the Foundation may only approve a landowner's or child's request to transfer a lot upon the occurrence of the following events:

(1) Notice to the Foundation of a transfer pursuant to:

(a) A bona fide foreclosure of a mortgage or deed of trust; or

(b) A deed in lieu of foreclosure;

(2) The death of the landowner or landowner's child;

---

statutes it administers should, "in recognition of the agency's expertise in the field, [be] give[n] . . . great deference unless it is in conflict with legislative intent or relevant decisional law, or is clearly erroneous, arbitrary, or unreasonable." *Dep't of Economic & Employment Dev. v. Lilley*, 106 Md.App. 744, 762, 666 A.2d 921 (1995); *see also Md. Aviation Admin. v. Noland*, 386 Md. 556, 573 n. 3, 873 A.2d 1145 (2005). Some commentators have criticized this deferential approach, contending that it is appropriate for review of mixed questions of fact and law, but not for pure questions of law, which a court should always determine *de novo*, on constitutional, separation-of-powers grounds. *See* Arnold Rochvarg, *Maryland Administrative Law* 155–57 (2d ed.2007) (citing *Comptroller of the Treas. v. Citicorp Int'l Comm. Inc.*, 389 Md. 156, 184, 884 A.2d 112 (Wilner, J., dissenting)).

This area is well developed in federal law. Under the *Chevron* doctrine, if there is an ambiguity in a statute that an agency administers, the court must defer to the agency's interpretation so long as the agency's interpretation is reasonable. *See Chevron USA Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, the Foundation's interpretation of Ag–1999 § 2–513, embodied in its "long-standing administrative practice," was not promulgated as a formal regulation. *See, e.g., Christensen v. Harris County*, 529 U.S. 576, 586–87, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."). Therefore, it would be " 'entitled to respect,' " but only to the extent that it had the " 'power to persuade.' " *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

(3) A decree of divorce where the landowner or child is ordered to sell or transfer the lot as part of a bona fide property settlement;

(4) A change of employment location of the landowner or child where the Foundation determines that it would be impractical for the landowner or child to commute to the new work location; or

(5) Any other circumstance, as determined by the Foundation, where it would be impossible [18] for the landowner or child to continue to occupy the dwelling.

The regulation also mandates: "A landowner or child who has a lot released under the terms of the easement may not transfer or lease the lot if a dwelling has never been constructed on the lot." COMAR 15.15.06.05(B). And, it provides that "[a] person who transfers a lot in violation of this chapter is in violation of the agricultural land preservation easement applicable to the farm." COMAR 15.15.06.06.

Notably, COMAR 15.15.06 was adopted by the Department of Agriculture as an emergency regulation, *after* the enactment of Chapter 498. Indeed, it was adopted after the Foundation tendered its proposed Final Release to appellant. The regulation became effective on an emergency basis on July 17, 2006, only shortly before appellant filed suit. *See* 33 Md. Reg. 1417, 1435 (Aug. 18, 2006) ("Notice of Emergency Action"). It was proposed as a permanent regulation on August 18, 2006, *id.* at 1473–74 ("Notice of Proposed Action"), and was permanently adopted effective November 6, 2006. 33

---

18. As the circuit court remarked, "impossible" is a "pretty high standard." Tr. at 17. *Cf. Baldi Construction Engineering, Inc. v. Wheel Awhile, Inc.,* 263 Md. 670, 673, 284 A.2d 248 (1971) (under the contract law doctrine of impossibility of performance, "the financial inability of one of the contracting parties to meet the contract price," is not an adequate ground for rescission of contract). It bears noting that, under the Foundation's "long-standing administrative practice" prior to the enactment of Chapter 498 and COMAR 15.15.06, as attested by MALPF Executive Director James Conrad in his affidavit, the Foundation's conditions for transfer were less stringent: the Foundation needed only to determine that it was "impracticable" for the dwelling to be occupied by the owner.

Md. Reg. 1703, 1733–34 (Oct. 27, 2006) ("Notice of Final Action"). Until that point, according to Conrad, the Foundation adhered to a similar, unwritten policy that was a "long-standing administrative practice." We have no basis to conclude that COMAR 15.15.06 is an impermissible regulation under the present provisions of Agric. § 2–513, as amended by Chapter 498. Because the regulation postdates Chapter 498's enactment, however, it cannot be seen as an interpretation of the statutory scheme that existed before Chapter 498, under Ag–1999 § 2–513. Moreover, we are not persuaded that the Foundation's "long-standing administrative practice," prior to Chapter 498's enactment, was a correct or reasonable interpretation of Ag–1999 § 2–513.

In our view, the Foundation's interpretation is problematic in terms of the plain text of the statute. In essence, the Foundation believes that the statute creates a *de facto* restriction on the ability to sell an owner's lot, because the Foundation believes that only the original landowner may use the lot for residential purposes. But the statute plainly contemplates that an owner's lot will be owned by other persons after the original owner. The statute provides: "Any release, preliminary release, building permit, or other document issued or submitted in accordance with this paragraph shall be recorded among the land records where the land is located and shall bind all future owners." Ag–1999 § 2–513(b)(2)(vii). Indeed, given the finite duration of a human life, one must expect that persons other than the original landowner will one day own an owner's lot. If the Foundation were correct that such subsequent owners could not "use" the lot for residential purposes, any subsequent owner would be forced to tear down the dwelling on the owner's lot and return the land to agricultural use. Although this result is, in some sense, in harmony with the purpose of the agricultural preservation easement scheme to preserve land for agricultural use, it seems a perverse way of ensuring agricultural preservation.

Our conclusion that the Foundation's interpretation does not accord with the Legislature's intent is supported by consideration of the history of § 2–513 of the Agriculture Article. The

legislative history reveals that appellant is correct: the Legislature intended that the right reserved "only for the landowner" is the right to obtain the release of an owner's lot. In turn, that would enable the grantor to build a house on the lot and subsequently sell both the lot and the house, free of easement restrictions. Although the Foundation cites certain recent elements of the statutory history in support of its interpretation, it is apparent, on closer inspection, that the history of Agric. § 2–513, including the amendments cited by MALPF, lend support to appellant's position.

The Foundation was created and empowered to acquire agricultural preservation easements by 1974 Md. Laws ch. 642. The 1974 Act set forth form language to be used in a deed to convey an agricultural preservation easement. *Id.* Deeds of easement executed under the 1974 Act only prohibited "industrial or commercial activities, with the exception of farming" on burdened property. *Id.* at 2183. Such deeds did not explicitly restrict the residential use of the land. They did bar subdivision of the land without the Foundation's permission, however, and restricted the structures built or maintained on burdened property to "(i) farm buildings or structures and (ii) a single-family dwelling and outbuildings commonly or appropriately incidental thereto...." *Id.*

In 1977, the General Assembly enacted 1977 Md. Laws ch. 883, which is the source of § 2–513. In the 1977 Act, the Legislature "remov[ed] from the Code the form of the easement," and instead "establish[ed] criteria for easements." Easements under the 1977 Act were to "provide that residential subdivision for commercial purposes is not permitted." 1977 Md. Laws ch. 883 § 1, at 3409 (enacting § 2–513(b)). But, the 1977 Act created the procedure by which a landowner and his children could each receive a one-acre lot for "the purpose of construction of one dwelling house intended for his or their use," and provided that this procedure "does not constitute a residential subdivision for commercial purposes." *Id.* During its consideration by the General Assembly, the bill that would become the 1977 Act was amended to require that only "the owner who originally sold an easement to the

Foundation" and that owner's children were eligible for the residential lots.

The subsequent history of § 2–513 is one of continuing refinement of the release scheme.[19] In 1981, the Legislature amended § 2–513 to require that, "[b]efore any conveyance is made pursuant to this subsection, an owner shall agree with the Foundation not to subdivide any land conveyed. This agreement shall be recorded among the land records where the land is located and shall bind all future owners." 1981 Md. Laws ch. 347, at 1707.

A 1982 amendment, 1982 Md. Laws ch. 613 (enacting H.B. 420), established a maximum number and density of children's lots that could be released from an easement. The 1982 Act allowed, *id.* at 3352,

> the owner to convey, free of the easement restrictions, not more than 1 acre or less at a maximum density of not more than 1 acre for each 20 acres or portion thereof not to exceed 10 lots of 1 acre or less on any farm parcel, subject to the easement to any child of the owner for the purpose of constructing a dwelling house intended for use by that child.

In addition, the 1982 amendment introduced the requirement that "[t]he owner shall pay the State for the release of the easment [sic] or for the benefit of conveying free of the easement restrictions at the price per acre that the State paid the owner for the grant of the easement." *Id.* This requirement was the subject of a Senate Bill in the same session, *see* S.B. 95, Gen. Assem. (Md.1982), which was added to the House Bill that ultimately became the 1982 Act by amendment

---

**19.** Several enactments amended § 2–513 in ways that are not germane to this appeal. *See* 1988 Md. Laws ch. 507 (increasing maximum lot size to 2 acres under certain conditions); 1989 Md. Laws ch. 465 (revising maximum lot size conditions); 1996 Md. Laws ch. 624 (same); 1997 Md. Laws ch. 467 (amending density restriction); 2003 Md. Laws ch. 278 (temporary enactment intended to benefit a "certain landowner" in Carroll County); 2004 Md. Laws ch. 374 (concerning landowner's option to construct "tenant houses"); 2006 Md. Laws ch. 76 (permitting landowner to relocate existing dwelling under certain conditions); 2006 Md. Laws ch. 174 (revising maximum lot size restrictions); 2008 Md. Laws ch. 105 (amending release requirements).

in both chambers. *See* Bill File, H.B. 420, Gen. Assem. (Md.1982).

Notably, the 1982 Act also provided that, upon application, "the Foundation shall release from the easement restrictions 1 acre or less of the land subject to the easement for the purpose of constructing a dwelling house for the use of ~~the~~ *only that* owner *who originally sold an easement to the Foundation* . . . ."(strikeout and underlining in original, indicating amendments to the bill as originally introduced). This is the source of the language that the Foundation interprets as a restriction of use of the dwelling house to the original owner.

The "Legislative Comment" on H.B. 420, submitted by the Department of Agriculture to the House Finance Committee, explained that the purpose of the bill was to "alter[ ] the number of residential lots which may be subdivided and transferred to the children of the owner of land on which an agricultural land preservation easement has been sold. . . ." Dep't of Agric., Legislative Comment on H.B. 420, at 1 (April 5, 1982). The Department recounted that under the then-current version of § 2–513, the owner was entitled to " 'conveyance of one acre or less for the owner who originally sold an easement to the Foundation and for each of his children for the purposes [sic] of construction of one dwelling house intended for his or their use. . . .' " *Id.* (quoting § 2–513(b), as enacted by 1977 Md. Laws ch. 883). The Department explained, *id.* at 1–2:

Several problems have arisen from these provisions in implementation of the program.

First, in some instances, especially where the Foundation secures an easement on a farm of smaller than average size, the permissibility for lot transfer is too great, to the extent that it may jeopardize the integrity of our preservation investment. . . . This amendment would place a ceiling on the number of lots which can be subdivided for children at one lot per 20 acres of land plus one lot for the owner.

The Department also explained the rationale for the amended language in the bill that specified that the lot release was

for "the purpose of constructing a dwelling house for the use of ~~the~~ *only that* owner *who originally sold an easement to the Foundation....* " 1982 Md. Laws ch. 613 (strikeout and underline in original indicating amendment to bill as originally introduced). The Department said, Legislative Comment at 2:

> Since the bill was drafted and filed, we have found an omission of language of considerable importance which should be restored to the language of the proposed bill. Currently, the permissibility of lot transfer is applicable only to the landowner who originally sold an easement to the Foundation. This is an important protective provision for which an amendment to H.B. 420 was provided in the House.

Thus, the legislative history of the 1982 Act suggests that the intent of the Legislature was merely to reserve to the original landowner the right to obtain lot releases.

Further elements of the legislative history confirm this interpretation. The bill file for S.B. 95, the Senate companion bill to H.B. 420, contains a letter from Michael I. Volk, a legislative drafting analyst for the General Assembly, to Senator John A. Cade. Letter from Michael I. Volk to Senator John A. Cade (Jan. 27, 1982). Mr. Volk wrote that he was responding to Senator Cade's inquiry: "What happens if the child [who acquires a child's lot] dies—is the easement reinstated?" *Id.* at 1. Volk responded that "the use of the acre for the child's residential dwelling is a personal covenant that does not run with the land...." *Id.* at 2. Moreover, Volk stated that "a subsequent owner of the acre or house is not bound to maintain the property as a residence and may utilize it as he sees fit...." *Id.* This letter also militates against the Foundation's present position that until the enactment of Chapter 498, § 2–513 imposed a perpetual restriction on the use of an owner's lot.

In 1987, the Legislature again amended § 2–513, this time to close a "loophole" created by the 1982 Act.1987 Md. Laws ch. 65 (enacting H.B. 164). The substantive change introduced by the 1987 Act was to extend the 1982 Act's density

restriction to all owner's lots and children's lots on a burdened property, rather than merely the children's lots. The Summary of Committee Report that accompanied H.B. 164 on its favorable recommendation from the Senate Economic and Environmental Affairs Committee explained:

> Current law provides a loophole for owners of property on which an easement has been purchased that does not exist for the children of the landowner who has received a conveyance. A landowner with a 200–acre easement is presently permitted to convey 10 lots to his children and develop an eleventh lot for the owner's use. Two or more landowners of the same 200–acre easement could make 20 conveyances and hold 2 owners' lots. Both scenarios, allowable under current law, exceed the one-lot-per-twenty-acre limit that was intended when the agricultural easement program was initiated.

S. Econ. & Envir. Affairs Cmte., Summary of Comm. Report, H.B. 164, Gen. Assem. (Md.1987), at 2. Thus, the 1987 Act closed this loophole by providing: "The total number of lots allowed to be released under this section may not exceed 10 lots of 1 acre or less at a maximum of not more than 1 lot for each 20 acres or portion thereof." 1987 Md. Laws ch. 65 § 1, at 477 (enacting § 2–516(b)(2)(i)).

The 1987 Act significantly restructured § 2–513(b)(1), breaking it into several subparagraphs. It introduced language stating specifically that "the Foundation shall release [an owner's lot] free of easement restrictions only for the landowner who originally sold an easement." However, this addition, and the restructuring of the section, were only intended to "restructure[ ] the current format for the sake of clarity," according to a "Legislative Comment" on the bill by the Department of Agriculture. *See* Md. Dep't of Agric., Legislative Comment on H.B. 164 (Feb. 3, 1987). The Legislature apparently did not intend a substantive change by the introduction of the phrase "the Foundation shall release free of easement restrictions only for the landowner . . . ."

A 1994 amendment, 1994 Md. Laws ch. 683 (enacting H.B. 1501), introduced the two-step process for obtaining a release. The favorable floor report for H.B. 1501 from the House Committee on Appropriations noted that the bill "was drafted ... with the intent of preventing unintended development abuse through the easement release process." H. Cmte. Appropriations, Floor Report—1994 Session, H.B. 1501, at 1. The two-step process was intended "to ensure that all statutory conditions for the release are met[.]" *Id.*

As we have seen, between the time of the parties' execution of the Deed of Easement and the Foundation's tender of the proposed Final Release, the General Assembly enacted Chapter 258 (2003) and Chapter 498 (2004). As noted, Chapter 258 created a new, alternative procedure to obtain the release of an "unrestricted lot," in lieu of the owner's lots and children's lots available under the prior release scheme. According to the Foundation, Chapter 258 supports its interpretation that Ag–1999 § 2–513 restricted the alienability of an owner's lot. The Foundation asserts:

> Chapter 258 ... provides further support that it was the Legislature's intent to prohibit landowners from selling or transferring an owner's lot for a dwelling released to them under the Deed of Easement. Chapter 258 allows a landowner who conveys an easement on or after October 1, 2003, to elect an "unrestricted" lot for a dwelling under the Deed of Easement in lieu of the restricted owner's lot. Unlike the case for the owner's lot, Chapter 258 provides that the "unrestricted lot may be subdivided from the easement and sold to anyone to construct one residential dwelling ... *at any time.*" (Emphasis supplied). If a landowner is free to transfer an owner's lot at any time, as Mr. Claggett claims, there would have been no need for the Legislature to establish an "unrestricted" lot right.

The Foundation overlooks significant differences between the "unrestricted" lot release permitted by Chapter 258 and the pre-existing scheme for release of a "restricted" owner's lot in other sections of Ag–1999 § 2–513. First, under the pre-existing scheme, an owner's lot could not be released "at

any time," nor does appellant so claim. An owner's lot could not be released until the original landowner applied for a release, committed not to further subdivide the lot, and submitted a non-transferable building permit for construction of a dwelling house that was to be for that landowner's use only. *See* Ag–1999 § 2–513(b)(2). Critically, this option was only available to the original landowner. *Id.* The parties agree that, if the original landowner sold a burdened property without having acquired the release of an owner's lot, the option to release an owner's lot would be gone forever. The option could not be transferred to a subsequent purchaser. In contrast, under Chapter 258, "[i]f the property is transferred before the right to exclude the lot has been exercised, the right may be transferred with the property." Chapter 258 (enacting Agric. § 2–513(b)(3)(vii)).

Moreover, under Chapter 258, "[a]n unrestricted lot may be subdivided by the landowner from the easement and sold to anyone to construct one residential dwelling[.]" Chapter 258 (enacting Agric. § 2–513(b)(3)(ii)). In contrast, under Agric. § 2–513, when a landowner applies for the release of a restricted lot, the two-step procedure ensures that only that landowner may construct a dwelling on the lot. Finally, under Chapter 258, "[t]he right to the lot is taken into consideration in the appraisal of fair market value and determination of easement value[.]" Chapter 258 (enacting Agric. § 2–513(b)(3)(v)). Under the restricted lot process of § 2–513, on the other hand, the landowner must repay the State the per acre price of the owner's lot. Ag–1999 § 2–513(b)(2)(iii).

There are significant differences between the procedures. Most important, the release scheme of Ag–1999 § 2–513 does not, even under appellant's interpretation, permit the release of an owner's lot "at any time." Thus, the fact that the Chapter 258 procedure permits the release of an owner's lot "at any time" does not militate against appellant's interpretation.

Finally, the Foundation urges that Chapter 498 itself is evidence of the fact that, until Chapter 498's enactment, Ag–

1999 § 2–513 prohibited the sale of an owner's lot to a third party at any time. The Foundation argues that the General Assembly "enact[ed] Chapter 498 (HB 164) in response to the ongoing concern over the illegal transfer of owner's lots to ineligible persons *after a dwelling is constructed.*" (Emphasis in original.) In support of its position, the Foundation quotes from the Senate Floor Report to H.B. 164:

> According to MALPF, most program participants understand the restrictions on the development rights that they have sold to MALPF. However, MALPF reports that sometimes there is an incentive to develop family lots for commercial profit by selling those lots to ineligible third-parties. Though the two-stage lot release process makes it difficult for the lot to be transferred to an ineligible third party before a house is constructed, a substantial incentive still exists to build a house as a speculative investment to be sold to a third-party once the house is ready for occupancy. Under current law, MALPF has no way to verify that lots are developed for legitimate purposes. This bill is intended to allow MALPF to review the subsequent transfer of family lots for five years after they have been released from the easement to verify that the transfer is legitimate.

The Foundation's argument is unconvincing. To be sure, " 'subsequent legislation can be consulted to determine legislative intent.' " *Reier*, 397 Md. at 35, 915 A.2d 970 (quoting *Nesbit v. Gov't Employees Ins. Co.*, 382 Md. 65, 78, 854 A.2d 879 (2004)). In our view, however, this statement from Chapter 498's legislative history supports appellant's position, rather than the Foundation's. It is clear that, since the inception of the agricultural preservation easement program, the Legislature has sought to ensure that the release process will not be abused by landowners seeking to profit from residential development. Nevertheless, the quoted passage from the Senate Floor Report demonstrates that, until the passage of Chapter 498, the Foundation "ha[d] no way to verify that lots are developed for legitimate purposes," and that landowners were able to "build a house as a speculative investment to be sold to a third-party once the house is ready

for occupancy." This statement is inconsistent with the proposition that Ag–1999 § 2–513 prohibited the sale of an owner's lot to a third party because, as the beneficiary of an agricultural preservation easement, the Foundation would have been able to enjoin such sale if the sale were prohibited by the terms of easements executed under the pre-Chapter 498 statute.

Plainly, the Legislature frowned upon the practice of using the lot release program as a vehicle for speculative investment in residential real estate—it enacted Chapter 498 to end the practice. Yet, the fact that the Legislature enacted Chapter 498 is testament to the view that the activity, while perhaps counter to the spirit of the agricultural land preservation program, was legal until Chapter 498 became law.

In sum, the Foundation's interpretation of Ag–1999 § 2–513 creates unreasonable results, while appellant's interpretation harmonizes the statutory language. Moreover, the statutory history of Agric. § 2–513 supports appellant's interpretation, rather than the Foundation's. We conclude that, until Chapter 498 was enacted, § 2–513 of the Agriculture Article permitted a landowner who obtained the release of an owner's lot, and constructed a dwelling on the lot, to sell the lot and house free of easement restrictions.

Even if any ambiguities remained, however, we would be required to resolve them in appellant's favor. As noted, the rights of the parties in this case arise from the contractual relationship established by the Easement and the Preliminary Release, the terms of which are tied to the statute. It is well established that, " 'when the State enters into a contract with constitutional authority, it acquires rights and incurs responsibilities like those of any individuals, who are parties to such a contract.' " *Mooney v. Univ. System of Md.,* 178 Md.App. 637, 645, 943 A.2d 108 (quoting *State v. Dashiell,* 195 Md. 677, 692, 75 A.2d 348 (1950)), *cert. granted,* 405 Md. 290, 950 A.2d 828 (2008).[20]

---

**20.** Principles of contract interpretation are relevant here. Maryland courts subscribe to the objective theory of contract interpretation,

Here, neither the Preliminary Release nor the Deed of Easement explicitly included any restriction on the alienability of the Owner's Lot. Rather, the two documents are subject to the same ambiguities as the statute. Paragraph (1)(b) of the Deed reproduces the language of Ag-1999 § 2-513(b)(2), stating:

As a personal covenant only and one that is not intended to run with the land, the Grantee, on written application from the Grantor, shall release free of easement restrictions only for the Grantor who originally sold this easement, [an owner's lot] for the purpose of constructing a dwelling house for the use only of the Grantor. . . .

Further, the Deed provided: "The right reserved to the Grantor under paragraph (1)(b) belongs only to the Grantor who originally sold this easement and may be exercised only by the Grantor named in the instrument." This language does not provide clarity, however; it does not illuminate the nature of the right that is reserved to the Grantor.

The Preliminary Release stated that "it is the intent of this instrument to release [the Owner's Lot] from agricultural easement restrictions set forth in the . . . Deed of Easement

---

under which we give effect to the plain meaning of a contract. *Rhoads v. Sommer*, 401 Md. 131, 151, 931 A.2d 508 (2007); *Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700 (2007). "When the language of a contract 'is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court.' " *Forty West Builders, Inc., supra*, 178 Md.App. at 377, 941 A.2d 1181 (quoting *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620 (2001)), *cert. denied*, 405 Md. 63, 949 A.2d 652 (2008). Ordinarily, we "do not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran*, 398 Md. at 16, 919 A.2d 700. Instead, "we look at what a reasonably prudent person in the same position would have understood as to the meaning of the agreement. Ambiguity arises if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning." *Id.* at 17, 919 A.2d 700 (internal citation omitted). But, "[a] contract is not ambiguous simply because, in litigation, the parties offer different meanings to the language. It is for the court, supposing itself to be that reasonably prudent person, to determine whether the language is susceptible of more than one meaning." *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 751, 929 A.2d 932 (2007).

for the purpose of constructing a dwelling. The parties agree that this right may not be transferred to any person." The Preliminary Release also stated that it was subject to "the condition that its use be for the purpose of constructing a dwelling house for the owner's residence." Once again, this was not an explicit restriction on alienability of the Owner's Lot. At most, it restricted the dwelling house to be "for the owner's residence," but made no provision for the event that the owner might sell the lot.

 In any event, if the meaning of a contract is ambiguous, even after resort to extrinsic sources, the contract " 'must be construed against ... the drafter....' " *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.,* 390 Md. 449, 456, 889 A.2d 387 (2006) (quoting *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 509–10, 667 A.2d 617 (1995)). *See also Anderson Adventures LLC v. Sam & Murphy, Inc.,* 176 Md.App. 164, 179, 932 A.2d 1186 (2007) (" '[W]here an ambiguity exists in a contract, the ambiguity is resolved against the party who made it or caused it to be made, because that party had the better opportunity to understand and explain his meaning.' ") (citation omitted).

 Moreover, "there is a significant interest in promoting the free alienability and marketability of land. A person or entity generally should have primary control over the disposition of property he, she, it owns." *David A. Bramble, Inc. v. Thomas,* 396 Md. 443, 460, 914 A.2d 136 (2007). In *Lowden v. Bosley,* 395 Md. 58, 909 A.2d 261 (2006), the Court explained that Maryland adheres to the principle of "reasonable strict construction" of restrictive covenants: " 'If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement.' " *Id.* at 67, 909 A.2d 261 (quoting *Belleview v. Rugby Hall,* 321 Md. 152, 158, 582 A.2d 493 (1990)). In other words, in the absence of contrary extrinsic evidence, "an ambiguous covenant [should] be read narrowly in favor of the free alienability and use of land...." *City of*

*Bowie v. Mie Properties, Inc.*, 398 Md. 657, 680, 922 A.2d 509 (2007).

As noted, we presume that the General Assembly legislates with full knowledge of existing law and policy. *See Taylor v. Mandel, supra,* 402 Md. at 131, 935 A.2d 671. And, it is established in the common law and policy of this State that, where there is ambiguity in the terms of a restrictive covenant, we must construe the terms against their drafter and in favor of the free alienability and use of land. Thus, to the extent that the Legislature left the terms of easements under the agricultural land preservation program ambiguous, we assume that the Legislature intended for the scales to tip in favor of the landowner.

Accordingly, because appellant executed his Deed of Easement and received his Preliminary Release before the enactment of Chapter 498, he is not required to obtain the Foundation's approval in order to transfer his Owner's Lot to a third party. Chapter 498 prospectively altered the substantive terms of agricultural preservation easements. As noted, the Foundation makes no argument that the Legislature intended for a statute that substantively altered the vested rights of landowners to have retroactive effect; it merely argues that Chapter 498 did not alter vested rights. Because we conclude otherwise, we also conclude that Chapter 498 may not be applied retroactively to appellant with respect to his Owner's Lot.

**JUDGMENT REVERSED. COSTS TO BE PAID BY APPELLEES.**