985 A.2d 565

MARYLAND AGRICULTURAL LAND PRESERVATION
FOUNDATION, et al.

v.

Herschell B. CLAGGETT, Sr.

No. 142, Sept. Term, 2008.

Court of Appeals of Maryland.

Dec. 22, 2009.

46

**48**

Steven M. Sullivan, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., Craig A. Nielsen, Thomas F. Filbert, Asst. Attys. Gen.), on brief, for Petitioners.

Willard C. Parker, II (Sarah M. Everhart, Parker Counts & Melton, LLP, Easton), on brief, for Respondent.

Margaret Ann Nolan, County Solicitor, Lisa Stello O'Brien, Sr. Asst. County Solicitor, Melissa Shane Shipkey, Asst. County Solicitor, Amicus Curiae.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

In this appeal, we construe the terms of an agricultural easement conveyed by respondent Herschell Claggett, Sr. to petitioner Maryland Agricultural Land Preservation Foundation ("Foundation") over his 208.39–acre Kent County proper-

ty ("Claggett Property") for the sum of $262,190.50.[1] At issue is whether the Foundation must grant a release from that easement for a two-acre lot which allows Claggett to not only construct a dwelling house thereon, but also to sell that lot to a third-party free of the agricultural easement. We shall hold that the Deed of Easement and Preliminary Release only allow for the release of acreage to construct a dwelling house for the use of the landowner or landowner's child and that they do not permit a transfer to a third-party free of that restriction.

## FACTS AND LEGAL PROCEEDINGS

### The Foundation, Its Governing Statute, And Provisions In Effect At Deed Execution

As the Court of Special Appeals explained:

The Foundation is empowered "[t]o acquire ... easements ... to restrict the use of agricultural land ... to maintain the character of the land as agricultural land. . . ." Md.Code (2007 Repl.Vol., 2008 Supp.), § 2–504 of the Agriculture Article ("Agric."). [Footnote omitted.] *See also* Agric. § 2–502 (establishing the Foundation). The terms of such easements are dictated by the Agriculture Article, and require the grantors to covenant, "for so long as profitable farming is feasible" on the burdened land, Agric. § 2–514(a), that the land will not be used "for any commercial, industrial, or residential purpose." Agric. § 2–513(b).

*Claggett v. Md. Agric. Land Pres. Found.*, 182 Md.App. 346, 352–53, 957 A.2d 1083, 1086 (2008).

The General Assembly created the Foundation to acquire easements by purchase and other means "to restrict the use of agricultural land and woodland as may be designated to maintain the character of the land as agricultural land or

---

1. We shall refer to respondent as "Claggett," and to petitioner as "the Foundation." The agricultural easement dated February 1, 2000 will be termed "The Easement" or "Deed of Easement." A preliminary limited release of the Easement, effective October 17, 2002 will be called "the Preliminary Release."

woodland[.]" Md.Code (1974, 1999 Repl.Vol.), § 2–504(3) of the Agriculture Article (AG–1999).[2] In preserving agricultural land and woodland, the legislature's intent was to:

provide sources of agricultural products within the State for the citizens of the State; control the urban expansion which is consuming the agricultural land and woodland of the State; curb the spread of urban blight and deterioration; and protect agricultural land and woodland as open-space land.

AG–1999 § 2–501.[3] The legislature also provided for provisions to be included in those easements, expressed in AG–1999 Section 2–513. Under AG–1999 Section 2–513(b)(1), a landowner "whose land is subject to an easement, may not use the land for any commercial, industrial, or residential purpose." AG–1999 Section 2–513(b)(2) allows a landowner to obtain a release for the construction of a dwelling house:

Except as provided in paragraph (5) of this subsection, on written application, **the Foundation shall release free of easement restrictions only for the landowner who originally sold an easement, 1 acre or less for the purpose of constructing a dwelling house for the use only of that landowner or child of the landowner subject to the following conditions:**

\*     \*     \*

(iii) The landowner shall pay the State for any acre or portion released at the price per acre that the State paid the owner for the easement.

---

2. This case involves amendments to the Agriculture Article that are pertinent to the issue on appeal. We shall refer to the 1999 Replacement Volume of the Agriculture Article—the law in effect at the time of the Deed of Easement's execution—as "AG–1999."

3. The Foundation reports that it has acquired or has contracted to acquire, as of the end of FY 2007, permanent conservation easements on 1,933 farms with 265,691 acres. MARYLAND AGRICULTURAL LAND PRESERVATION FOUNDATION FIVE-YEAR ANNUAL REPORT, FISCAL YEARS 2003–2007 1 (January 11, 2008), *available at* http://www.malpf.info/reports/AR2007 Distn.pdf. The Foundation has expended nearly $500 million to acquire its easements. *Id.*

(iv) Before any conveyance or release, the landowner and the child, if there is a conveyance to a child, shall agree not to subdivide further for residential purposes any acreage allowed to be released. The agreement shall be recorded among the land records where the land is located and shall bind all future owners.

(v) After certifying that the landowner or child of the landowner has met the conditions provided in subparagraphs (i) through (iv) of this paragraph, the Foundation shall issue a preliminary release which shall:

1. Become final when the Foundation receives and certifies a non-transferrable building permit in the name of the landowner or child of the landowner for construction of a dwelling house; or

2. Become void upon the death of the person for whose benefit the release was intended if the Foundation has not yet received a building permit as provided in this subparagraph.

(vi) Any release or preliminary release issued under this paragraph shall include a statement of the conditions under which it was issued, a certification by the Foundation that all necessary conditions for release or preliminary release have been met, and copies of any pertinent documents.

(vii) Any release, preliminary release, building permit, or other document issued or submitted in accordance with this paragraph shall be recorded among the land records where the land is located and shall bind all future owners.

(viii) The Foundation may not restrict the ability of a landowner who originally sold an easement to acquire a release under this paragraph beyond the requirements provided in this section.

(Emphasis added.)

Finally, under AG–1999 Section 2–513(b)(5)(i), the Foundation may grant a modified release of up to two acres for a dwelling house if regulations adopted by the Department of the Environment or the jurisdiction in which the land is situated require a minimum lot size of at least two acres.

### The Deed Of Easement

On February 1, 2000, Claggett conveyed an agricultural preservation easement to the Foundation "in consideration of the sum of . . . $262,190.50[.]" The Easement contains the following general covenant, stating the intention of the parties:

[T]he Grantor covenants for and on behalf of Grantor, the personal representatives, successors and assigns of the Grantor, with the Grantee, its successors and assigns, to do and refrain from doing upon the . . . land all and any of the various acts set forth, it being the intention of the parties that the said land shall be preserved solely for agricultural use in accordance with the provisions of the Agricultural Article, Title 2, Subtitle 5, Annotated Code of Maryland, and that the covenants, conditions, limitations and restrictions hereinafter set forth, are intended to limit the use of the above described land and are to be deemed and construed as real covenants running with the land.

The Easement then specifies particular *"COVENANTS, CONDITIONS, LIMITATIONS AND RESTRICTIONS[,]"* which reflect the provisions contained in AG–1999 Section 2–513(b):

A.   Subject to the reservations hereinafter contained, the Grantor for the Grantor, the heirs, personal representatives, successors and assigns of the Grantor, covenants and agrees as follows:

(1)   (a) *Except as otherwise provided in this instrument, the [Claggett Property] may not be used for any commercial, industrial, or residential purpose.*

(b)   As a personal covenant only and one that is not intended to run with the land, the Grantee, on written application from the Grantor, *shall release free of easement restrictions only for the Grantor* who originally sold this easement, 1 acre or less *for the purpose of constructing a dwelling house for the use only of that Grantor or the Grantor's child* subject to the following conditions:

(i)   The total number of lots allowed to be released under this paragraph may not exceed 10 lots of 1 acre or less at

a maximum of not more than 1 lot for each 20 acres or portion thereof;

* * *

(iii) Before any conveyance or release, the Grantor and the child, if there is a conveyance to a child, shall agree not to subdivide further any acreage allowed to be released; the agreement shall be recorded among the land records where the land is located and shall bind all future owners[.] (Emphasis added).

Subsection (A)(1)(c) of the Easement provides what must be included in an "Application for Lot Exclusion" before a lot may be released "for the construction of a dwelling house[.]" Among other requirements, an application must contain "a declaration that the lot and dwelling house are only for the use of the landowner or the landowner's child, whichever is the case[.]" Subsection (A)(1)(d) copies the AG–1999 Section 2–513(b)(2)(v) two-step procedure by which the Foundation shall issue a release:

After certifying that the landowner or child of the landowner has met the conditions provided in subsections (a) and (b) of this section, the Foundation shall issue a Preliminary Release which shall:

(i) Become final when the Foundation receives and certifies a non-transferrable building permit in the name of the landowner (or child of the landowner if the proposed lot is intended for the landowner's child's use) for the construction of a dwelling house; or

(ii) Become void upon the death of the person for whose benefit the release was intended if the Foundation has not yet received a building permit as provided in this regulation.

The Easement provides further that "[t]he right reserved to the Grantor under paragraph (1)(b) belongs only to the Grantor who originally sold this easement and may be exercised only by the Grantor named in the instrument."

Section B in the Easement contains additional covenants. Among these is Subsection (7), which states: "If the Grantor has any doubts concerning the easement, covenants conditions, limitations or restrictions herein contained with respect to any particular use of the said land, the Grantor may submit a written request to the Grantee for consideration and approval of such use."

### *The Preliminary Release*

Claggett requested a release "to exclude a 2.00 acre owner's lot from [his] 208.39 acre easement property for the construction of a dwelling intended for [his] use" (hereinafter "Owner's Lot"), which the Foundation approved on June 28, 2001. The Foundation indicated in a letter that "[t]his lot exclusion was approved as presented in accordance with the provisions of [his] Deed of Easement and in accordance with [the] Agricultural Article . . . which grants an allowance of a maximum lot size of up to 2.00 acres if required by regulations adopted by the Department of the Environment or the county."

The letter informed Claggett that any lot released would be done so pursuant to the "two-stage release process" articulated in AG–1999 Section 2–513 and that a Preliminary Release and Agreement would be recorded in the land records outlining conditions of the release. The Foundation's letter further stated that upon compliance with all of the terms and conditions of the Preliminary Release and Agreement, a "second (final) Release and Agreement [would] also be recorded upon request releasing the lot of all easement restrictions once a non-transferrable building permit [was] presented to the Foundation in [Claggett's] name." Finally, the letter indicated that "[b]efore a preliminary release [could] be prepared, [Claggett must provide] the following: 1. Reimbursement of the amount paid to [Claggett] by the Foundation for the requested lot. Our records show this total amount to be $2,470, @ $1,235 per acre. 2. A metes and bounds description of the lot[.]"

Following receipt of the letter, Claggett remitted payment and a metes and bounds description of the Owner's Lot. The

Foundation then sent Claggett a Preliminary Release and Agreement, which was filed on October 17, 2002, with the following pertinent provisions:

**WHEREAS,** pursuant to Agriculture Article 2–513(b)(3) of the Annotated Code of Maryland and Section A(1) of the Covenants, Conditions, Limitations and Restrictions of the said Deed of Easement, as a personal covenant, the Releasees only may exclude from the easement restrictions up to two (2) acres ... upon written application to the Releasor for the owner's use for the purpose of constructing a dwelling house for owner's residence.

*    *    *

**NOW, THEREFORE,** in consideration of the mutual promises, payment by the Releasees to the Releasor of the sum of $2,470.00 and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Releasor hereby conditionally releases [the Owner's Lot] ... from restriction contained in the agricultural land preservation easement, subject, however, to the terms and conditions hereinafter set forth, **including the condition that its use be for the purpose of constructing a dwelling house for the owner's residence.** [ (Emphasis added).]

SUBJECT TO THE FOLLOWING<br>TERMS AND CONDITIONS

1.  The Releasees, on behalf of themselves, their Personal Representatives and assigns, the survivor of them, his or her Personal Representatives and assigns, grant and relinquish the right to subdivide the above described **2.00** acres of land that is to be released from easement restrictions recorded among the land records of Kent County, Maryland in Liber 0190, Folio 558. This grant and relinquishment of right shall be deemed and construed as a real covenant, running with the land, and shall bind all current and future owners and any other person, firm or corporation having any interest in the subject property.

2.  This preliminary release shall:

(a) Become final when the Foundation receives and certifies a nontransferable building permit in the name of the landowner for the construction of a dwelling house and issues a final release; or

(b) Become null and void upon the death of the person whose benefit the release was intended if the Foundation has not received a building permit as provided in the subparagraph.

3. Subject to the proceeding Paragraphs 1 and 2 it is the intent of this instrument to release the above described 2.00 acres parcel of land from agricultural easement restrictions set forth in the above mentioned Deed of Easement for the purpose of constructing a dwelling. The parties agree that this right may not be transferred to any person. However, all of the terms, covenants, conditions, limitations and restrictions set forth in the Deed of Easement shall remain in force, operation and effect on the remaining portions of the Releasees' land not herein or heretofor expressly released.

4. The Releasor does not warrant or represent to the Releasees, their assigns, the survivor of them, or the survivor's Personal Representatives/Successors or assigns, that the release and conveyance of the above described one (2.00) acre or less will comply with county or local zoning laws or requirements or imply an approval which could negate any county or local zoning laws, requirements, or any specific use for which the Releasees may have intended.

5. Upon compliance with all of the terms and conditions hereinabove set forth, the Releasees shall have the right to request that the above described parcel of 2.00 acres be released from the operation and effect of the Deed of Easement subject only to the Terms and Conditions set forth in Paragraphs 1, 3 and 4 above.

### Amendments To Section 2–513

#### The 2003 Amendment

Effective October 1, 2003, the General Assembly enacted 2003 Maryland Laws Chapter 258 ("Chapter 258"), which

added a new Section 2–513(b)(3), allowing a landowner to reserve a single lot for exclusion from easement restrictions in lieu of the right to reserve an owner's lot:

A landowner may reserve the right to exclude 1 unrestricted lot from an easement in lieu of all owner's and children's lots to which the landowner would otherwise be entitled under [Section 2–513(b)(2) ].

\*     \*     \*

(ii) An unrestricted lot may be subdivided by the landowner from the easement and sold to anyone to construct one residential dwelling[.]

### The 2004 Amendment

This section was modified when the General Assembly enacted Maryland Laws, Chapter 498 ("Chapter 498"), which mandated that different terms be included in a release made pursuant to Section 2–513(b)(2)(vi) of the Agriculture Article, to be effective October 1, 2004 (hereinafter "AG–2004"):

Any release or preliminary release issued under this paragraph shall include:

1. A statement of the conditions under which it was issued, a certification by the Foundation that all necessary conditions for release or preliminary release have been met, and copies of any pertinent documents; and

**2. A statement that the owner's or child's lot may not be transferred for 5 years from the date of the final release, except on:**

A. Approval by the Foundation; or

B. Notwithstanding any conditions on transfers imposed under item 1 of this subparagraph, a lender providing notice to the Foundation of a transfer pursuant to a bona fide foreclosure of a mortgage or deed of trust or to a deed in lieu of foreclosure.

(Emphasis added.)

### The Disputed Final Release

Claggett submitted a building permit and request for final release in 2005. On June 7, 2005, the Foundation sent Clag-

gett a Final Release and Agreement ("Final Release") with a letter requesting that he "return the signed document to the Foundation" so that it could be signed on behalf of the Foundation and then recorded in the Kent County land records. The Final Release included the following language reflecting the 2004 amendment to Section 2–513(b)(2)(vi)(2):

[I]t is the intent of this instrument to release the [Owner's Lot] for the personal residential use of the person named in the building permit[.] ... **The parties agree that this right may not be transferred to any other person for five (5) years from the date of the final release, except on:**

(a) Approval by the Foundation; or

(b) Notwithstanding any conditions on transfers imposed under item 1 of this subparagraph, a lender providing notice to the Foundation of a transfer pursuant to a bona fide foreclosure of a mortgage or deed of trust or to a deed in lieu of foreclosure.

(emphasis added).

Claggett refused to sign the Final Release. In a letter to the Foundation, Claggett's counsel questioned whether Claggett was subject to the Final Release requirement prohibiting a transfer of the Owner's Lot " 'to any other person for five (5) years from the date of final release[.]' " In a September 12, 2005 letter, the Foundation responded:

By ["Chapter 498"] Mr. Claggett is subject to the requirements described in ... the final release, and by this law also, the Foundation does not have the authority to release his lot until this requirement is met.

\* \* \*

As the easement grantor, only Mr. Claggett has the one time right to an owner's lot for the purpose of constructing a dwelling solely for his personal use. Before Chapter 498's enactment the law did not allow a released lot for a dwelling to be conveyed to any other person but restricted its use to the landowner who sold the easement. This left the released owner's lot in legal limbo with lenders and others

that was corrected by the enactment of Chapter 498 (effective October 1, 2004) that now allows certain transfers.

\* \* \*

Chapter 498 . . . provides a benefit to landowners, such as Mr. Claggett, who make application for allowable lot releases after October 1, 2005; again, this benefit allows them to transfer owner's lots to others, whereas before, the law did not provide this opportunity.

Lastly, the Foundation does not have the authority to waive the language release requirements of Chapter 498; Mr. Claggett applied for a lot release after Chapter 498's effective date and he is subject to its requirements.

### Circuit Court Proceedings

Claggett filed a Complaint for a Writ of Mandamus and Declaratory Judgment in the Circuit Court for Kent County on November 9, 2006 and an amended complaint on January 8, 2007. In his complaint, Claggett requested a declaratory judgment that Chapter 498 "may not be applied retroactively to modify the terms and conditions of the Deed of Easement or the terms and conditions of the final release to which [Claggett] is entitled." He also petitioned for a writ of mandamus ordering the Foundation to execute a final release that did not include the terms derived from Chapter 498. Finally, Claggett sought damages in the amount of $100,000.

The Foundation filed a Motion to Dismiss/Motion for Summary Judgment and the court granted summary judgment in favor of the Foundation on April 24, 2007. The court denied Claggett's claim for damages under the doctrine of sovereign immunity and ruled that Claggett was subject to the terms of the Final Release and Chapter 498.

### The Court Of Special Appeals Decision

Claggett appealed the Circuit Court's judgment to the Court of Special Appeals (the CSA) and it reversed. *Claggett,* 182 Md.App. at 393, 957 A.2d at 1110. After reviewing legislative history, the CSA concluded that "until Chapter 498

was enacted, [AG–1999 Section 2–513] permitted a landowner who obtained the release of an owner's lot, and constructed a dwelling on the lot, to sell the lot and house free of easement restrictions." *Id.* at 390, 957 A.2d at 1108. The CSA held, moreover, that "neither the Preliminary Release nor the Deed of Easement explicitly included any restriction on the alienability of the Owner's Lot. Rather, the two documents are subject to the same ambiguities as [AG–1999 Section 2–513]." *Id.* at 391, 957 A.2d at 1109. The CSA rejected the Foundation's contention that Claggett's release request was subject to 2004 amendment to Section 2–513:

Chapter 498 prospectively altered the substantive terms of agricultural preservation easements. As noted, the Foundation makes no argument that the Legislature intended for a statute that substantively altered the vested rights of landowners to have retroactive effect; it merely argues that Chapter 498 did not alter vested rights. Because we conclude otherwise, we also conclude that Chapter 498 may not be applied retroactively to [Claggett] with respect to his Owner's Lot.

*Id.* at 393, 957 A.2d at 1110.

We granted a writ of certiorari to consider the Foundation's following questions:

I. Do the requirements of [AG–2004 Section 2–513(b)], as amended by 2004 *Laws of Maryland,* Chapter 498, apply to a final release from land preservation easement for construction of a dwelling for the use of the landowner, which the landowner requested in 2005?

II. Prior to the October 1, 2004 effective date of [Chapter 498], did the landowner have a vested right to obtain final release of easement allowing him to construct a dwelling and to sell the dwelling and lot at any time to any unrelated third party, where such a right was not expressly provided by statute, regulation, or deed of easement, and where the landowner did not apply for the final release or satisfy the necessary conditions by submitting the required building

permit until sometime in 2005, more than six months after the effective date of the 2004 legislation?

## DISCUSSION

### *Standard of Review*

"Our standard of review of the declaratory judgment entered as the result of the grant of a motion for summary judgment is whether that declaration was correct as a matter of law." *S. Easton Neighborhood Ass'n v. Town of Easton,* 387 Md. 468, 487, 876 A.2d 58, 70 (2005). "We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Educ. Testing Serv. v. Hildebrant,* 399 Md. 128, 140, 923 A.2d 34, 41 (2007). Where there is no genuine dispute of material fact, as is the case here, we proceed to review determinations of law. *Remsburg v. Montgomery,* 376 Md. 568, 579, 831 A.2d 18, 24 (2003).

### *The Parties' Contentions*

The Foundation contends that Claggett's final release request is subject to the five-year restriction on transfers found in Chapter 498—the 2004 amendment to Section 2–513(b). *See* AG–2004 § 2–513(b)(2)(vi). In other words, it asserts that Claggett's requested final release must include the language provided in the amended version of the statute. The Foundation offers several reasons why the 2004 amendment should govern, and Claggett responds to these with arguments of his own.

We do not address these arguments about the applicability of the 2004 Amendment because in our view, the case is more readily resolved by interpretation of the language of the Deed of Easement granted by Claggett and the Preliminary Release executed by the Foundation. In this regard, the Foundation argues that the Easement did not reserve for the Grantor the right to transfer an owner's lot to a third party free of the use restrictions contained in the Easement. In response, Claggett contends that "the plain meaning of the [Easement does not]

authoriz[e] the inclusion of a restriction on the transfer of title to an Owner's Lot once the requirements for a release have been met by the original grantor of the easement." (formatting altered.).

Claggett first focuses on both paragraph (A)(1)(b) of the Easement, which refers to the Owner's Lot release as a "personal covenant only and one that is not intended to run with the land," and language in the preliminary release which provided that "it is the intent of this instrument to release [the Owner's Lot] from agricultural easement restrictions set forth in the [Easement] for the purpose of constructing a dwelling. The parties agree that this right may not be transferred to any person." Claggett argues that these provisions merely reserve to the original grantor the right to apply for the release of an Owner's Lot and thereafter construct a dwelling, rather than prohibit the owner from subsequently transferring that parcel to a third party.

### Court's Analysis

We begin our construction of the Deed of Easement by reviewing the principles that govern interpretation of such instruments.

> In construing the language of a deed, the basic principles of contract interpretation apply. The grant of an easement by deed is strictly construed. The extent of an easement created by an express grant depends upon a proper con-struction of the conveyance by which the easement was created. The primary rule for the construction of contracts generally—and the rule is applicable to the construction of a grant of an easement—is that a court should ascertain and give effect to the intention of the parties at the time the contract was made, if that be possible.

*Miller v. Kirkpatrick*, 377 Md. 335, 351, 833 A.2d 536, 545 (2003) (quotation marks and citations omitted). As we stated in *White v. Pines Community Improvement Association, Inc.*, 403 Md. 13, 32, 939 A.2d 165, 176 (2008), the language of the agreement itself is of foremost importance:

" 'A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed.' "

(Citations omitted.) The principles of deed construction require, moreover, consideration of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution[.]" *Chevy Chase Land Co. v. United States*, 355 Md. 110, 123, 733 A.2d 1055, 1062 (1999) (citations omitted). "[W]e must consider the deed as a whole, viewing its language in light of the facts and circumstances of the transaction at issue as well as the governing law at the time of conveyance." *Id.* "[T]he primary consideration in construing the scope of an express easement is the language of the grant." *Id.* at 143, 733 A.2d at 1073. Furthermore,

[i]f the grant contains no limitations, the court will attempt to discern what the parties would have reasonably expected, and will usually be generous in its interpretation. The language of the easement can grant to the easement holder a good deal of discretion in the use of the easement or limit the use very narrowly; if the grant is not clear, the court will interpret the scope of the easement in favor of free and untrammeled use of the land.

*Id.* at 145, 733 A.2d at 1074 (*citing* 7 THOMPSON ON REAL PROPERTY § 60.04(a), at 451 (Thomas ed.1994) (quotation marks, footnotes, and citations omitted)).

In applying these principles, we must first clarify what is at issue in this appeal. Although as a practical matter, use and title may go hand in hand, when analyzing an easement, it is use, not title that is involved. With this in mind, we look carefully at the Deed of Easement. Claggett, in granting the Easement, agreed: "Except as otherwise provided in this instrument, the [Claggett Property] may not be **used** for any

... residential purpose." (Emphasis added). Thus, our task is to determine what, if any, exceptions from this general prohibition against residential use are contained in the document.

Section A(1)(b) contains a limited exception:

As a personal covenant only and one that is not intended to run with the land, the Grantee, on written application from the Grantor, shall release free of easement restrictions only for the Grantor who originally sold this easement, 1 acre or less for the purpose of constructing a dwelling house for the use only of that Grantor or the Grantor's child[.]

It is clear from this language that the dwelling house may only be used by the Grantor or the Grantor's child. This provision excludes any possible inference that the parties to the Easement, speaking objectively, intended that an unrelated third party could dwell in a house on the Claggett Property.

Claggett would have us construe the language in Section A(1)(b) that classifies the right to a release for a dwelling as "a personal covenant only and one is not intended to run with the land" to mean that if the Owner's Lot is transferred, it is free of all easement restrictions and can be used by anyone for any purpose. We do not see this as a reasonable construction of the instrument. This language simply means that if Claggett were to transfer title to the servient property or to the "owner's lot" contained therein, which he may do, the new owner does not acquire the right to obtain a release to use the property as a dwelling, free of the agricultural preservation easement. The Easement is written this way because the agricultural preservation Easement is not a grant to the Foundation of title to the land, and it does not restrict land transfer. The Easement simply prescribes use of the land for certain purposes. So the instrument makes clear that, while the land may be transferred, the new owner does not receive the same right to a limited release of a lot (for a dwelling) from the agricultural preservation restrictions. In short, the new owner could use the Claggett Property for any agricultural activities, but cannot use the property as a dwelling.

Subsection A(1)(c) reiterates this intent with its requirement that any release from the easement restrictions must contain "a declaration that the lot and dwelling house are only for the use of the landowner or the landowner's child, whichever is the case[.]"

Subsection A(1)(d), regarding the two-step procedure to obtain a release, says:

> After certifying that the landowner or child of the landowner has met the conditions provided in subsections (a) and (b) of this section, the Foundation shall issue a Preliminary Release which shall:
>
> (i) Become final when the Foundation receives and certifies a non-transferrable building permit in the name of the landowner (or child of the landowner if the proposed lot is intended for the landowner's child's use) for the construction of a dwelling house; or
>
> (ii) Become void upon the death of the person whose benefit the release was intended if the Foundation has not yet received a building permit as provided in this regulation.

We see this subsection as perfectly consistent with the others discussed above—it creates a procedure whereby a building permit can be obtained in order to allow Claggett or his child to build a house. Although Claggett takes comfort in subparts (d)(i) and (ii), arguing that they mean that once the house is built, it can be used as a dwelling for any person, we do not read this language as he does. Not only does the clause fail to state that a third person may live there, but such an interpretation is diametrically opposed to the clear language in section A(1)(b) restricting use of the property released from the Easement to use as a dwelling for Claggett or his children.

Subsection (A)(1)(e) is equally clear, providing that "[t]he right reserved to the Grantor under paragraph (1)(b) belongs only to the Grantor who originally sold this easement and may be exercised only by the Grantor named in the instrument." Claggett's argument that this right consists of a right to obtain a building permit, build a house, and then sell the house for use as a dwelling for a third person is inconsistent with

this language—if the intent were to allow the Grantor to profit by a sale of the lot free of the use restrictions, there would be no reason to require that he be the one to obtain the building permit and construct the house.

Claggett points to no other language in the Easement, and we find none, which creates an exemption from his covenant that his property "may not be **used** for any ... residential purpose." (Emphasis added). Without additional language in the Easement which would meet the "[e]xcept as otherwise provided in this instrument" requirement, the overall restriction in section A(1)(a) prohibiting use of the property "for any commercial, industrial, or residential purpose" still applies. We do not see any ambiguity in the instrument, and construe it according to its plain language. Contrary to Claggett's argument, there is no need for any further explicit provision against third party use after the house is built because the express covenant against use of the entire property, which is subject to the easement, contains this use restriction, and there is nothing in the instrument that states a contrary intent.

### Preliminary Release

We next examine the Preliminary Release. We agree with Claggett that even if the Easement did not accord Claggett a right to transfer a lot free of the agricultural preservation restrictions, any grant of release from the terms of the Easement in the Preliminary Release would bind the Foundation. Thus we carefully examine the Preliminary Release, keeping in mind the terms of the Easement for interpretive purposes.

The Preliminary Release states in the introductory paragraph that "as a personal covenant, the Releasees only may exclude from the easement restrictions up to two (2) acres ... for the owner's use for the purpose of constructing **a dwelling house for owner's residence**." (Emphasis added). In the formal grant of the release, the instrument states: "the Releasor hereby conditionally releases [the Owner's lot] ... from restriction contained in the agricultural land preservation

easement, subject, however, to the terms and conditions here-inafter set forth, including the condition that its use be for the purpose of constructing a dwelling house for the owner's residence." Later, a condition set forth in paragraph 3 of the instrument states the intent that the lot be released "for the purpose of constructing a dwelling. The parties agree that this right may not be transferred to any person." Paragraph 5 states that "the Releasees shall have the right to request that the above described parcel of 2.00 acres be released from the operation and effect of the Deed of Easement subject only to the Terms and conditions set forth in Paragraphs 1, 3 and 4 above."

Claggett maintains, quoting the CSA, that neither the Easement or the Preliminary Release conditions include an explicit restriction on the alienability of the Owner's Lot. At most, it restricted the dwelling house to be for the owner's residence, but made no provisions for the event that the owner might sell the lot. *See Claggett,* 182 Md.App. at 377, 957 A.2d at 1101. The Deed and Preliminary Release are silent on the question of transfer to a third party and, he argues, because these instruments are "susceptible of two interpretations, public policy favors the interpretation least restrictive of the right to alienate freely." *See Julian v. Christopher,* 320 Md. 1, 9, 575 A.2d 735, 738–39 (1990) (holding that "[b]ecause there is a public policy against restraints on alienation, if a lease is silent on the subject, a tenant may freely sublease or assign.").

We disagree with Claggett and the CSA because we think the notion of selling the lot is inconsistent with the language of the Easement and Preliminary Release. These instruments are silent on the topic of a third party dwelling in and owning the lot because the parties intended to restrict that from happening. There was no intent that a person granting an agricultural easement, who benefitted from the price paid by the government-supported Foundation while retaining the ability to farm the land at a profit, also be able to develop a lot and sell it at a profit. The profits are enhanced by the Easement—the fair market value of that lot might

increase substantially because it was located amidst land protected by an agricultural easement.

In the preliminary clauses, the instrument states that the Preliminary Release "conditionally releases [the Claggett Property] from restriction contained in the agricultural land preservation easement, subject, however, to the terms and conditions hereinafter set forth, including the condition that its use be for the purpose of constructing a dwelling house **for the owner's residence.**" (Emphasis added). We do not see language in the Preliminary Release expressing any intent that the instrument intends to release the restrictions so clearly stated in the Easement with regard to who may dwell on the Owner's Lot.

The CSA considered meritorious Claggett's argument that language in AG–1999 indicated an intent that the easements would permit transfer of a lot free of agricultural restrictions. It opined:

> In our view, the Foundation's interpretation is problematic in terms of the plain text of the statute. In essence, the Foundation believes that the statute creates a *de facto* restriction on the ability to sell an owner's lot, because the Foundation believes that only the original landowner may use the lot for residential purposes. But the statute plainly contemplates that an owner's lot will be owned by other persons after the original owner. The statute provides: "Any release, preliminary release, building permit, or other document issued or submitted in accordance with this paragraph shall be recorded among the land records where the land is located and shall bind all future owners." AG–1999 § 2–513(b)(2)(vii).

*Claggett*, 182 Md.App. at 381, 957 A.2d. at 1103. In our view the quoted language in the statute does not suggest that the transfer may be made free of the agricultural restrictions. It simply recognizes that the title can be changed by execution and recordation of a deed, but if it does, the restrictions, including limitations on who may live in the dwelling, remain in effect. Their efficacy is assured by record notice to any

buyer that the covenants and restrictions run with the land and are binding on future owners.[4]

The CSA went on to make a more interesting point:

Indeed, given the finite duration of a human life, one must expect that persons other than the original landowner will one day own an owner's lot. If the Foundation were correct that such subsequent owners could not "use" the lot for residential purposes, any subsequent owner would be forced to tear down the dwelling on the owner's lot and return the land to agricultural use. Although this result is, in some sense, in harmony with the purpose of the agricultural preservation easement scheme to preserve land for agricultural use, it seems a perverse way of ensuring agricultural preservation.

182 Md.App. at 381, 957 A.2d at 1103. Although this observation is astute, we do not think that consideration of the future prospects for the house after the death of both Claggett and his children should require our deviation from the language of the Easement and the Preliminary Release. Moreover, in light of the passage of AG–2004, and the Foundation's expressed adoption of the 5–year limitation on any use restriction that would prohibit transfer of such lot to a third party free of the restrictions, the issue is moot.

The CSA interpreted this language differently, pointing out that, although the Easement restricted use of the lot for the grantor's dwelling, it did not contain an explicit restriction on

---

**4.** The intermediate appellate court also carefully analyzed and found unpersuasive some arguments by the Foundation based on legislative changes occurring after the Easement was executed. *See Claggett v. Md. Agric. Land Pres. Found.,* 182 Md.App. 346, 386, 957 A.2d 1083, 1107 (2008). We do not rely on these contentions of the Foundation for our decision. Additionally, the CSA mentions a letter written by a legislative drafting analyst for the General Assembly to Senator John A. Cade in answer to his inquiry about the status of the restrictions on a lot owned by a grantor's child upon the death of the child. Although this is legitimate legislative source for interpretation, we are not bound to agree with this drafting analyst. Nor does the inquiry address the question of application of the use restrictions during the lifetime of the Grantor.

alienability of the Owner's Lot. At most, it restricted the dwelling house to be for the owner's residence, but made no provision for the event that the owner might sell the lot. *See Claggett,* 182 Md.App. at 377, 957 A.2d at 1101. Our analysis differs, perhaps because we view this dispute as one about the use of land rather than the ownership of land-the Easement restricted use, not transfers. Because the Easement contained covenants running with the land, and recorded among the appropriate land records, it was not necessary to restrict transfer of title in order to effectuate the intended restrictions on use.

These restrictions in the Deed of Easement are consistent with the agricultural preservation purpose as stated in AG–1999 Section 2–501. The General Assembly created the Foundation to preserve agricultural land as open-space land and curb the spread of "urban blight and deterioration[.]" AG–1999 § 2–501. The owner's lot release conditions reflect an intent to limit new construction on program-participating properties. An unrestricted right to sell an owner's lot once released would undermine this purpose by facilitating potential real estate speculation through an ostensible request to build a dwelling for the grantor or his children. The Easement reflects this purpose, expressly stating an intention that the property "shall be preserved solely for agricultural use in accordance with the provisions of the Agricultural Article, Title 2, Subtitle 5 . . . and that the covenants, conditions, limitations and restrictions . . . are intended to limit the use of the [property under easement] and are to be deemed and construed as real covenants running with the land."

The General Assembly clearly entrusted the Foundation with stewardship responsibility over program-participating properties to ensure that the program's preservation purposes are fulfilled. *See* AG–1999 Section 2–513(b)(1) (stating that a landowner "may not use the land for any . . . residential purpose.")[5] This intent is carried forward in Claggett's Deed

---

5. A 2004 Floor Report for the bill that was ultimately enacted as 2004 Laws of Maryland Chapter 498 reflects these pre–2004 limitations on

of Easement. *See* § B(7) (stating that "[i]f the Grantor has any doubts concerning the easement, covenants conditions, limitations or restrictions herein contained with respect to any particular use of the said land, the Grantor may submit a written request to the Grantee for consideration and approval of such use"). Under these terms, Claggett certainly may request authorization to transfer his lot to a third-party, but ultimately it is the Foundation's province to grant his request. Indeed, the Foundation maintains that its practice has been to grant such requests when "it would be impracticable for the dwelling to be occupied by the owner."

Because Claggett did not possess an unrestricted right to transfer the Owner's Lot to a third-party when he obtained the Preliminary Release and Agreement, he was not deprived of any vested right when the Foundation incorporated Chapter 498's five-year restriction on transfer in the Final Release. Indeed, according Claggett the right to transfer his lot after five years actually **expanded** Claggett's transfer rights under the terms of the Preliminary Release and Agreement. There was no retroactive application of Chapter 498 that worked to his detriment.

Accordingly, Claggett may not transfer the dwelling constructed on his requested Owner's Lot to a third-party without first obtaining approval from the Foundation. Neither the

transfer and the Foundation's role in ensuring that Owner's Lot transfers are for legitimate purposes:

According to [the Foundation], most program participants understand the restrictions on the development rights that they have sold to [the Foundation]. However, [the Foundation] reports that sometimes there is an incentive to develop family lots for commercial profit by selling those lots to **ineligible third parties.** Though the two-stage lot release process makes it difficult for the lot to be transferred to an ineligible third party before a house is constructed, a substantial incentive still exists to build a house as a speculative investment to be sold to a third party once the house is ready for occupancy. Under current law, [the Foundation] has no way to verify that lots are developed for legitimate purposes. This bill is intended to allow [the Foundation] to review the subsequent transfer of family lots for five years after they have been released from the easement to verify that the transfer is legitimate.

(Emphasis added.)

Deed of Easement nor the Preliminary Release provide Claggett with an unrestricted right of transfer. The Final Release issued by the Foundation lawfully includes a statement that the lot "may not be transferred to any other person for five (5) years" from the date of the release except on "[a]pproval by the Foundation[.]"

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR KENT COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

Judge MURPHY joins in the judgment only.